(C. D. 1042)

O. Brager-Larsen *v.* United States

## United States Customs Court, First Division

(Decided January 31, 1947)

Barnes, Richardson & Colburn (Albert MacC. Barnes, Samuel M. Richardson, and Hadley S. King, of counsel) for the plaintiff.

Paul P. Rao, Assistant Attorney General (Robert C. O'Grady, Joseph B. Brady, Richard F. Weeks, and Herbert M. Rosenberg, special attorneys), for the defendant.

Charles Gold, amicus curiae.

Before OLIVER and KINCHELOE, Judges

OLIVER, Presiding Judge: Silver or black fox furs or skins are subject to duty under paragraph 1519 (c) of the Tariff Act of 1930. The trade agreement with Canada (T. D. 49752), effective January 1, 1939, fixed this rate of duty at 37½ per centum ad valorem.

This suit involves fox furs or skins classified as silver fox by the collector at the port of New York.

These furs, imported from Norway in December 1939, are claimed by plaintiff to be free of duty under the provision of paragraph 1681 for furs and fur skins, not specially provided for, undressed. That they are undressed is conceded by the Government. The basis of plaintiff's claim is that they are not silver or black fox furs or skins under the common meaning of that term.

The involved paragraphs of the Tariff Act of 1930 read as follows:

PAR. 1519 (c). Silver or black fox furs or skins, dressed or undressed, not specially provided for, 50 per centum ad valorem [Reduced to 37½% in Trade Agreement with Canada, T. D. 49752].

PAR. 1681 [Free List]. Furs and fur skins, not specially provided for, undressed.

The imported skins are bought, sold, and referred to in the fur trade as "platinum" or "platina," and, according to some of the witnesses, as "platinum silver foxes." To avoid unnecessary repetition, they will be referred to herein as platinum.

It should be noted at the outset that the words "silver" and "black" as applied to foxskins are synonymous terms and that the silver or black fox, as will appear hereinafter, is a variant form, color phase, or mutation of its progenitor, the common red fox. The platinum fox, in like manner, is a color phase of the silver fox.

While undressed fox furs in general are admitted free of duty (par. 1681), Congress has made specific provision in the dutiable list for "Silver or black fox furs or skins" (par. 1519 (c)).

The classification of a foxskin as silver or black is to be determined solely with reference to the character of the pelt, regardless of the breeding record of the animal from which it is produced. *Summary of Tariff Information, 1929, p. 1991.*

Plaintiff contends that the imported platinum foxskins do not conform to the commonly accepted definitions of the silver fox in that the predominating features of silver fox furs are entirely lacking therein, and that they differ so sharply from silver foxes as to be excluded from that category. At the time of the passage of the present tariff act in June 1930, platinum foxskins similar to those under consideration were not in existence.

The Government, while admitting that the imported merchandise would not fall within the common meaning of the term "silver fox" prevailing at the time of the passage of the Tariff Act of 1930, nevertheless contends (a) that common meaning is not necessarily to be restricted to that which existed when the tariff act was passed; (b) that the overwhelming weight of the testimony indicates that the common meaning of the term "silver fox" has vastly expanded since June 17, 1930; and (c) that furs like those at bar fall within such enlarged definition.

Extended hearings were held by this court both in New York and in Milwaukee. Forty witnesses were called and approximately 1,500 pages of testimony were taken. Eighty-seven exhibits were introduced in evidence, of which 56 are documentary.

Many of the exhibits introduced in this case are catalogs of auction companies issued in connection with fur sales (illustrative exhibits 22, 49, 58, 63, 68), wherein platina or platinum and whitemark foxes are listed and sold separate and apart from the silver foxes of different grades.

There are also many exhibits in the form of trade journals of the fur industry containing advertisements indicating that platinum fox furs similar to the merchandise here before us were variously offered for sale as "platinas" (exhibit 11), "silver platinums" (illustrative exhibit 14), "American platinum foxes" (exhibits 35, 36), "Genuine platinum fox . . . not platinum silver" (exhibit 43), and also that the February 17, 1944, issue of "Fur Trade Review" (exhibit 61) advertised such furs for sale under the description "New Type Silver Fox," on behalf of the "Progressive Color-Phase Silver Fox Association."

While the documentary evidence above referred to is informative and interesting, it is not controlling and its probative value is of no great weight.

Notwithstanding this formidable record, the issue before us for decision may be simply stated: Are these skins silver fox skins or are they not?

No platinum foxskins from the particular importation before us are in evidence. Plaintiff, however, has produced seven skins (illustrative exhibits 1–A to 1–G) which he testified were representative of the merchandise at bar. These exhibits were used throughout the trial as a basis for comparison with other types of foxskins.

A fairly composite description of the silver fox, based on dictionary definitions and the testimony and exhibits, is given below, and while there are no dictionary definitions for the platinum fox, its characteristics, based upon a careful analysis of the testimony and visual examination of the exhibits, are placed in parallel for ease of comparison.

| *Silver Fox* | *Platinum Fox* |
|---|---|
| *Under Fur:* Black to dark gray | *Under Fur:* White to pale gray |
| *Guard Hairs:* Black with white band and all black | *Guard Hairs:* White with black tips to all white |
| *Belly:* Dark gray to black | *Belly:* White to pale gray |
| *Paws:* Black | *Paws:* White to bluish white |
| *Ears:* Blackish | *Ears:* Pale bluish or pale gray |
| *Snout:* Black | *Snout:* Light |
| *Tail:* Small white tip | *Tail:* Large white tip |
| *Inside of mouth:* Black | *Inside of mouth:* Pinkish |
| *Average Size:* Smaller than platinum | *Average Size:* Larger than silver |
| *Overall Effect:* Dark background with silver veil | *Overall Effect:* Light-colored background with darker veil |

As to the above notation of "average size," it appears that platinum fox pups are larger at birth than ordinary silver fox pups, weighing about 20 per centum more (R. 987).

The Government, in support of the collector's classification, has offered substantial evidence to establish that in the past 26 years there has been an increasing demand in the trade for lighter silver foxes, although there was a time, up to 1927, when the darker shades brought higher prices. At present, silver foxskins are graded in accordance with the proportion of silver-ringed guard hairs on the pelt. They are bought and sold as ⅛, ¼, ½, ¾, ⅞, and full silvers. The demand in recent years being for lighter silvers, the breeders have, by selective matings of the lighter silvers, sought to and apparently have produced large numbers of the lighter full silvers. It is claimed that the imported platinums are of this kind, an unfortuitous type of silver fox, carefully worked out by such selective breeding, the offspring of silver-fox parents, and cannot be regarded as anything different from the silver fox so far as their tariff status is concerned.

The plaintiff, while maintaining that the science of genetics has no real bearing on this issue, has offered substantial evidence to the effect that the imported platinum foxes are not a type produced or brought into being by selective breeding, but are the result of a fortuitous biological change or phenomenon known as a mutation or color phase. "Mutation" and "color phase" are synonymous terms (R. 932, 938–A; exhibit 29, p. 20).

We are convinced from a careful examination of the record that it has not been established that there was any commercial meaning differing from the common meaning of the term "silver or black fox

furs or skins," either at the time of the passage of the tariff act under consideration or at any other time up to the date of the importation at bar, and that this case, therefore, depends for its determination upon the common and usual meaning of the term.

It is settled law that the common meaning of words, when in issue, is to be determined by the court as a question of law. *Sonn* v. *Magone*, 159 U. S. 417, 40 L. ed. 203; *Nix* v. *Hedden*, 149 U. S. 304, 37 L. ed. 745. In the determination of such meaning the court may consult dictionaries and other standard works. In cases where the court in its discretion has admitted the testimony of witnesses as to common meaning, such testimony is advisory only and is not binding on the court. *United States* v. *Stetson*, 21 C. C. P. A. 3, T. D. 46319; *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 C. C. P. A. 24, C. A. D. 209; *United States* v. *Macksoud*, 27 C. C. P. A. 218, C. A. D. 87.

It is the Government's contention in this case that the published definitions of silver foxes in the various recognized authorities do no more than attempt to describe the original "dark silver fox" and do not take into account the lighter variations developed subsequent to the passage of the Tariff Act of 1930, for which reason the published definitions of silver foxes are inadequate and became obsolete 10 years ago, although they sufficed 20 years ago.

In 1923, the United States Department of Agriculture issued Bulletin No. 1151 [exhibit 10 herein] entitled "Silver-Fox Farming," by Frank G. Ashbrook, Assistant Biologist, Division of Economic Investigations, Bureau of Biological Survey, which states:

The silver fox * * * is a color phase of the red fox. *It is dark all over, with silver hairs intermixed,* but no red, and the tip of the tail is generally, but not always, white. The *guard hairs* which give the silver appearance to the pelage *are not entirely white, but are black with a white band, and some guard hairs are entirely black.* * * * [Italics supplied.]

Dr. Ashbrook repeated the foregoing definition in "Fur Farming for Profit" published in 1929.

Max Bachrach, a fur consultant of 18 years' experience, author, and lecturer on the subject, and Government witness in this case, gives the following definition in his book "Fur" (1930; three reprints, the last in 1937; plaintiff's brief, p. 8):

*Color and character:* The general color of the silver fox is black, but there are several tones or shades, depending on the time of the year in which the peltry was taken. * * * Character is determined by the silvery hairs that are sprinkled throughout the peltry. These silvery hairs are of the guard hair variety and are not silvery throughout. *If a silvery hair be examined, it will be seen that the lower 3/5ths are black, the next fifth white, and the upper fifth or tip again black.* In a full silver type of peltry, the silvery hairs extend from the gills to the rump usually with no center black line. [Italics supplied.]

In books published subsequent to the date of this definition ("*Fur Digest,*" 1939, exhibit 78, R. 1428; "*Selling Furs Successfully,*" 1938,

exhibit ·79, R. 1428), Bachrach describes silver foxes in substantially the same language.

Examination of definitions in various dictionaries from as far back as 1903 up to the passage of the Tariff Act of 1930 discloses no material difference from those cited above. *The Encyclopaedia Americana, 1903; Encyclopaedia Britannica, 11th edition, 1910, and 14th edition, 1929; The Century Dictionary & Cyclopedia, 1911; Nelson's New Loose Leaf Encyclopedia, 1915 and 1928; Funk & Wagnalls New Standard Dictionary of the English Language, 1918; Webster's New International Dictionary, 1920 and 1927; The New International Encyclopaedia, 1926.*

This, likewise, is true of definitions in works published after the enactment of the Tariff Act of 1930. *Universal Dictionary of the English Language, 1932; The Encyclopaedia Americana, 1932; Nelson's New Loose Leaf Encyclopedia, 1932; Columbia Encyclopedia, 1935; Webster's New International Dictionary, 2d edition, 1936.*

It also appears that definitions subsequent to the date of the importation at bar (December 1939) show no deviation from those appearing throughout the past three decades. *Encyclopaedia Britannica, 1941; The Encyclopaedia Americana, 1941; Funk & Wagnalls New Standard Dictionary, 1942; Chamber's Technical Dictionary, Macmillan, N. Y., 1942.*

The 1944 edition of Webster's New International Dictionary, 5 years after the importation at bar and 3 years after the beginning of this trial, gives the identical definition for silver fox contained in its 1936 edition. It thus appears that there has been no change in the definition of silver fox from the one prevailing in 1903 up to 1944.

The definitions of the silver fox appearing in the standard dictionaries are not obsolete, as contended by the Government, and would cover the standard full or light silver said to be most in demand today. The definitions and the common meaning contemplate a fox having the basic characteristics hereinbefore described, and the presence of a greater number of silver-ringed black guard hairs does not alter but conforms strictly with such definitions.

It may be fairly stated that all definitions confirm the fact that the outstanding characteristic of the silver fox is that it is dark all over with silver intermixed, many of the guard hairs being silver-ringed.

Government witness Bachrach testified that while his definition of silver fox quoted above was good in 1930, it would not be good in 1939, and that he had revised it in the manuscript of a book in preparation but not yet published (R. 1423, 1427). He stated that in 1939 the definition should be modified in the following manner (R. 1425):

These silvery hairs are of the guard hair variety and are mostly silvery. If a silvery hair be examined it will be seen that the greater portion of that hair is

silvery. This silvery part *with black on both sides of it* stands out prominently and gives to the peltry the beauty for which it is noted. [Italics supplied.]

In response to interrogation by the court, Bachrach further testified (R. 1430):

Judge KINCHELOE: How do you form these different definitions? Do you just get them out of the sky, or are they dependent on the evolution in breedings and what is gotten in different litters? Are you following the trade in your definitions, or where do you get the new definitions?

The WITNESS: I follow the trade.

Judge KINCHELOE: Is that in the trade?

The WITNESS: Based on trade custom. I have to reverse myself when I find that I have become obsolete in some definition that I had made a year or two previous. * * *

Judge KINCHELOE: You make your definitions and renew them to satisfy the trade?

The WITNESS: I must conform to trade usage, yes.

This falls far short of impeaching any authoritative definition extant.

The general rule in the case of a tariff designation, such as "silver or black fox furs or skins," is that the meaning thereof, and hence its scope, must be determined as of the effective date of the act in which it is found. *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. 472, T. D. 44762, citing *Rossman* v. *Hedden*, 145 U. S. 561; *United States* v. *Belgam Corp. et al.*, 22 C. C. P. A. 402, T. D. 47402.

It is also well-established that tariff statutes are made for the future as well as for the present and are intended to bring within the purview of their provisions imported merchandise which is described therein, notwithstanding the fact that such merchandise, at the time of the law's enactment, was not known in our international commerce. *United States* v. *Salomon*, 22 C. C. P. A. 490, T. D. 47483; *United States* v. *Downing et al.*, 16 Ct. Cust. Appls. 556, T. D. 43294. But such merchandise, in order to be classified under a particular provision, must be fairly and clearly included within the language of the statute. *Newman* v. *Arthur*, 109 U. S. 132, 27 L. ed. 883.

The information concerning silver foxes supplied by the Tariff Commission to Congress when it had under consideration the bill which subsequently became the Tariff Act of 1930 appears in the Summary of Tariff Information (1929) as follows (p. 1986):

The silver fox is a variant form of the red fox. It is sometimes called "silver gray," "silver black," or "black." The tail is usually marked by a white tip as are other of the red species, *while the fur ranges through various shades of color from light gray to dark gray and black.* The light silver, for instance, is all silver except the neck, while the dark silver is black with the exception of its white-tipped tail. The long guard hair of the silver fox is peculiar in that it has *tri-colored hair, dark at the base, a bar of silver through the middle, and black* toward the tip. The best skins are those which are blue-black and glossy, the silver clear and bright, with no rusty or brown hairs. [Italics supplied.]

In the present case the fur of the platinums is practically white and

in general the long guard hairs are white at the base with a bar of black through the middle and white toward the tip.

The above Summary of Tariff Information then states (p. 1991):

\* \* \* *Fox pelts* should be classified under paragraph 1420 [Act of 1922] solely with reference to the character of the pelt, and therefore without any attempt to ascertain whether it is produced as a result of the crossing of a black or silver fox with any other breed. (C. I. E. 3685, of 1928.)

It will be noted that the Tariff Commission as late as 1939—the very year of the importation at bar—still regarded the silver or black fox as embraced within the description above set forth. In the "Digests of Trade Data," published by the Commission in 1939 with respect to the trade agreement with Canada, the following information is given (vol. IV, p. 15–6):

Silver or black fox is a color phase of the common red fox. This color phase is rare in nature, but it has been successfully produced in captivity through selective breeding. *Silver fox fur is a lustrous, long-haired, slate or black colored fur with silver hairs interspersed throughout the area of the back and head. The hairs which give the fur the silvery cast are black except for a white band near the end.* [Italics supplied.]

This latest definition of a silver or black fox given by the Tariff Commission in 1939 fails to include foxes with the physical characteristics of these platinum foxes.

Information supplied in such digests of trade data, while not binding on the court, may be considered as bearing on the identity of the merchandise under consideration. *United States* v. *Good Neighbor Imports, Inc.*, 33 C. C. P. A. 91, C. A. D. 321.

The merchandise at bar does not possess an essential resemblance to silver or black foxes in those particulars established as the criteria of their classification under paragraph 1519 (c). Hence, it cannot be said to be embraced within that classification by application of the doctrine that tariff acts are made for the future. In the words of Dr. Harold Elmer Anthony, Curator of Mammals at the American Museum of Natural History, testifying on behalf of the plaintiff, "There is some similarity with a silver fox, but there are more points of difference \* \* \*" (R. 1194).

This is further borne out by a consideration of the evidence in this record purporting to establish that the imported platinum foxes are the result of the phenomenon known as a mutation.

"Mutation" has been defined as a characteristic different from any in the ancestry of the individual displaying it, which breeds true. Mutations are like sports in showing abrupt departure from the hereditary characters of the species to which they belong but they differ in that such marked changes are transmissible to their offspring. *Van Nostrand's Scientific Encyclopedia (1938).*

The exact mechanics of the change inside the animal which precedes the external change in appearance where a mutation has taken place

is unknown, but it is due to some sudden rearrangement, probably of a chemical nature, inside the reproductive cells, after which some of the external characters of the resulting progeny are altered (R. 1147). Sports or sporadic offshoots from a standard type, not capable of reproducing their peculiar characteristics, are also known in the fox industry by such descriptive terms as "bastards," "freaks," "ring-necks," and "white-face."

The original Norwegian platinum fox was born in a litter of silver foxes in 1933. Its owner named the animal, a male, "Mons." It was bought by a silver-fox rancher, who, assuming this new color type might be due to a mutation, mated it to an unrelated silver vixen. This mating resulted in a litter of seven, of which three were ordinary silver foxes while four showed the coloring of their father, though of a somewhat darker type. The rancher described the new foxes as "platinum." There is no evidence in this record that the original platinum, "Mons," was the result of any selective breeding in Norway. In fact, all the evidence indicates that it was a fortuitous event, unexplained and unexpected.

Plaintiff Brager-Larsen testified that up to and including 1938 he had bought the entire production of platinum foxskins put on the market in Norway (R. 971), and that they were all descendants of "Mons" (R. 973). In world-wide travel prior to 1939, he stated that he did not see a single platinum fox anywhere outside of Norway, despite the fact that he was looking for them (R. 1051).

Otto L. Mohr, Professor of Anatomy at the University of Oslo, and Prof. Per Tuff, of the Veterinary High School, Oslo, made a prolonged study of the original platinum, "Mons," and his descendants, and published the results of this study in the June 1939 issue (vol. 30, No. 6) of "The Journal of Heredity" of the American Genetic Association (exhibit 45). They reported, in part, as follows:

A character of considerable commercial value arose by mutation in 1933 in a strain of ordinary silver foxes in Northern Norway. The character is denoted as platinum.

*     *     *     *     *     *     *

The character is inherited as a clear-cut autosomal dominant. The homozygous type is as yet unknown. Inbreeding of heterozygous platinum individuals has so far given platinum and silver foxes in the ratio of 2:1, but the numbers are so small that this deviation from expectation may well be accidental.

Analogous mutations have occurred independently on three (possibly four) additional occasions.

As to the platinum fur character they reported:

The platinum coloring is considerably lighter than that of ordinary silver foxes, usually a light grayish somewhat like the color of gray horses. The underfur is distinctly lighter than in silver foxes, from near white to a light grayish.

While the only marking in the silver fox is the white tip on the tail, the platinum foxes are characterized by extensive markings: white snout, a white blaze along the nose and forehead joining with a white collar around the neck * * *. The breast and a broad stripe on the belly are white * * * and the same is true of the legs and the distal part of the tail. * * *

The skin is of a grayish shade, somewhat lighter than the skin of silver foxes. * * *

After describing in detail the guard hairs, they state:

* * * *While the free end of these guard hairs is black in silver foxes it seems in the platinum foxes to be a general rule that all types of guard hairs under the microscope show an unpigmented tapered end.* [Italics supplied.]

As to the notation, contained in exhibit 45, that analogous mutations have occurred independently on additional occasions, Professors Mohr and Tuff state that phenotypically these other mutant types are very similar to the one first described ("Mons").

This exhibit refers in detail to three platinum fox mutations occurring in Norway in 1933, 1934, and 1937, respectively. In each instance, the parents were ordinary silver foxes. In a series of breeding tests, it was determined that these mutations were heterozygous, giving a proportion of both silver and platinum foxes among their offspring.

The June 1941 edition of "American Fur Breeder" (exhibit 40 for identification) contains an article entitled "History of the American Platinum on the Buffalo Bill Fur Farm at Cody, Wyoming," by W. A. Granquist, a witness for plaintiff in this case. It describes an "almost white" male pup that occurred in 1936 in a litter of silver foxes, whose parents and their ancestors were all silver foxes. It describes this pup, "America," as "the original platinum mutation, born in 1936." Subsequent matings of "America" and his offspring to silver foxes gave litters containing approximately equal numbers of platinums and ordinary silver foxes, but all attempts to mate platinum males to platinum vixens resulted in no progeny.

Dr. Leslie Clarence Dunn, genetecist and head of the Zoology Department of Columbia University, called on behalf of the plaintiff, testified that the test of a mutation is the sharpness of the change, the discontinuity with the parent and the fact that it breeds true in subsequent progeny (R. 1163). By "breeding true," he explained that he meant the appearance of the change *in orderly, specified ratios* in the progeny (R. 1164). Dr. Ernest Reed, Professor of Genetics at Syracuse University, testifying for the defendant, agreed with this statement in one instance (R. 1447), but perhaps inadvertently as indicated by contradictory testimony given both before and after such agreement. He testified (R. 1442) that "breeding true" meant following the predictions that would be made for a homozygous type, that is, if the parents were alike there could be no

deviation in the offspring. Again he testified (R. 1448, 1450) that if the mating of a platinum male with a platinum vixen resulted in a litter containing both platinum and silver pups, that would be no evidence of the presence or absence of a mutation, and the only conclusion permissible from such evidence would be that the parents were hybrid or heterozygous. The preponderance of evidence herein is contrary to the conclusion of the Government's witness, Dr. Reed, that such a mating would have to produce 100 per centum platinum offspring before it would be a mutation.

Based upon his experience and from an examination of the merchandise at bar (illustrative exhibits 1-A to 1-G), plaintiff's witness, Dr. Dunn, stated that this platinum fox is a mutation from the silver fox, giving the same results in breeding which are associated with many other mutations in his experience. He stated further that the platinum fox could just as well be a mutation direct from the red fox (R. 1158). Asked if the mating of silver foxes having fur like illustrative exhibits 3, 4, 5, and 6 would produce a fox like the merchandise at bar, he stated that it would not; but that if it did, that would "signalize a mutation" (R. 1152). He emphasized, however, that a mutation must be proved by breeding tests and cannot be diagnosed from external appearances alone (R. 1153).

. With this statement Government witness Reed could not agree, stating that there is nothing in illustrative exhibit 1-A (the platinum fox) that is not in illustrative exhibits 3, 4, 5, or 6 (the silver fox) (R. 1471). Dr. Reed stated further that if a fox like the latter exhibits produced a fox like illustrative exhibit 1-A, he could not class it as a mutant but would use it as evidence "that this was of a multiple factor inheritance nature."

We are of opinion, based upon this entire record, that the imported platinum skins are from foxes which are mutations from the silver fox. It is also evident from this record that the common understanding of the term "silver or black fox furs or skins" in paragraph 1519 (c) did not embrace or include platinum foxskins such as are here before us (illustrative exhibits 1-A to 1-G), either at the time of the passage of the 1930 act or at the date of the present importation.

While the fur of the silver fox, a color phase of the red fox, is, by act of Congress, subject to duty, the undressed fur of its progenitor, the red fox, would be admitted free of duty. In like manner, the undressed fur of the platinum fox, a color phase of the silver fox, is free of duty, notwithstanding that the fur of its progenitor, the silver fox, is subject to payment of duty.

Not being silver or black fox furs or skins as contemplated by paragraph 1519 (c) of the tariff act, the imported platinum fox furs

here before us are properly entitled to entry free of duty under paragraph 1681 as "Furs and fur skins, not specially provided for, undressed."

The protest is sustained and judgment will be rendered accordingly.