(C. D. 200)

JOSLYN MFG. & SUPPLY CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided August 14, 1939)

*G. W. R. Wallace; Barnes, Richardson & Colburn (Albert McC. Barnes* and *Joseph Schwartz* of counsel) for the plaintiff.

*Webster J. Oliver,* Assistant Attorney General (*Richard E. FitzGibbon* and *William J. Vitale,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the subport of Port Huron of the port of Detroit, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation described in the invoice as 160 "Cast Iron Ingot Moulds." Duty was levied thereon at the rate of 45 per centum ad valorem under paragraph 397, Tariff Act of 1930, as manufactures of metal not specially provided for. It is claimed that said merchandise is properly dutiable at but 20 per centum ad valorem under the following paragraph of said act:

PAR. 327. Cast-iron pipe of every description, and cast-iron fittings for cast-iron pipe, 25 per centum ad valorem; cast-iron andirons, plates, stove plates, sadirons, tailors' irons, hatters' irons, but not including electric irons, and castings and vessels wholly of cast iron, including all castings of iron or cast-iron plates which have been chiseled, drilled, machined, or otherwise advanced in condition by processes or operations subsequent to the casting process but not made up into articles.

or parts thereof, or finished machine parts; castings of malleable iron not specially provided for; cast hollow ware, coated, glazed, or tinned, but not including enameled ware and hollow ware containing electrical elements, 20 per centum ad valorem; molders' patterns, of whatever material composed, for the manufacture of castings, 50 per centum ad valorem.

Certain photographs of the castings in question were admitted in evidence as Collective Exhibit 1. In addition, the plaintiff offered the testimony of four witnesses.

The first, Roger Ralston, superintendent of the electric furnace department of the plaintiff corporation and a qualified metallurgist, testified that a casting of iron or steel is metal poured into a container in a molten condition, the container forming the general shape desired; that after freezing in the shape of the mold the molten metal assumes the shape of the mold; that a rough casting is one on which no machine work, such as that of the lathe, shaper, or drill, has been applied; that he was familiar with the merchandise herein and that the cast-iron molds in question are used as molds to make steel ingots which are steel castings; that the castings in the present case were rough castings upon which no machine work was done, which was proved by the fact that the imprint of the sand crystals was still upon them; that the articles depicted on the photograph admitted in evidence as Collective Exhibit 1 were representative of all of the merchandise involved herein; that there was no evidence in any of them of any chiseling, drilling, or machine work of any kind having been applied to or upon them; that an analysis of one of the molds in question, taken at random from the importation, showed no trace of vanadium, tungsten, molybdenum, chromium, nickel, or cobalt; that it showed 0.10 of 1 per centum of manganese and 1.24 per centum of silicon; and that the castings in question are not alloyed castings.

On cross-examination he testified that it was possible to tell by observation whether a casting was even slightly machined; that he saw the molds or castings involved in the present case at his company's plant at Fort Wayne, Ind., at the time they were received; that his company manufactures steel ingots; that the articles represented by Collective Exhibit 1 are molds in which steel ingots are cast; that the inside of the mold is fairly smooth due to the use of a baked core; that he had personally examined the entire 160 molds constituting the imported merchandise and that there were no tool marks or other evidence of machine work thereon; that they were not made by the open-hearth process but in a cupola; and that said molds are composed throughout of cast iron.

On redirect and recross-examination he testified that the molds in the case at bar were not malleable castings, a malleable casting having a very low carbon content which has been annealed to bring on graphite carbon.

The second witness, Anthony J. Blaeser, vice president of the plaintiff corporation, testified that he was familiar for many years with castings and had seen them made both in this country and in Canada; that he had seen some of the molds at issue in this case actually made at the foundry of the Dominion Wheel & Foundries, Ltd., of Toronto, Canada; that the molds which he saw were in various stages of manufacture, some finished, some partly finished, and some in the process of being cast; that in the process of casting, sand is placed around the core and the molten metal is simply poured into that core which when cooled makes the casting; that when the casting comes out of the core the sand and the runners or risers are knocked off; that in the case of the molds at bar there was no chiseling, drilling, or machining of any kind; that if there had been there would be tool marks on the mold or casting; and that the molds in this case were rough castings.

On cross-examination he testified that he actually saw the particular molds constituting the instant shipment in the process of manufacture; and that a mold has a hollow interior and a solid bottom so that you can pour molten iron or steel into it in order to make a casting.

On redirect examination the witness testified that the imported molds were themselves made in a mold and were made of cast iron, and that they are used for the purpose of casting steel ingots.

On recross-examination he testified that in the manufacture of the imported molds, flasks either of wood or steel are placed on the ground and a core box is placed inside them; that sand is then poured around the core-boxes; that the core-boxes together with the sand is termed a mold, and that the steel ingots manufactured by the witness' company in said molds are known as castings.

The third witness, Edgar Ritcey, assistant to the president of the Dominion Wheel & Foundries, Ltd., testified that the business of his company was the manufacturing of castings; that the merchandise covered by the invoices herein consisted of rough iron castings known as ingot molds; that he saw said castings shipped from his company's plant; that there is a hunk of metal on the top of each casting called a "gate" which is always chiseled off when the casting is finished; that no machine tool or grinding wheel of any kind is used inside of the casting; that except for the chiseling off of the rough gate the castings were shipped in the condition that they came out of the mold; that the material used in the production of the merchandise at bar consisted of pig iron and scrap iron which the witness purchased; that said material contained no vanadium, tungsten, molybdenum, cobalt, or other metallic substance used as an alloy in steel and iron; that said material

did not contain in excess of 5 per centum of phosphorus and did contain less than 3 per centum of either manganese or silicon; and that there was no work done on the castings in question by the lathe, shaper or drill.

On cross-examination the witness testified that he knew the purpose for which the merchandise in question was used; and that the articles are ingot molds used to make rough billets or ingots.

The last witness for the plaintiff, Walter Foreman of the Dominion Wheel & Foundries, Ltd., testified that all of the 160 castings covered by these invoices were made from the same raw material over a period of one month; that said raw material contained no vanadium, tungsten, molybdenum, chromium, or cobalt, or any other metallic element used in alloying steel or iron; that the only material used with the iron and steel consisted of 1¼ per centum of silicon, $\frac{9}{10}$ of 1 per centum of manganese, and less than 2 per centum of phosphorus; and that no lathe or other machine work was applied to said castings.

On cross-examination he testified that the things made by him consisted of ingot molds, and that they were made by pouring cast iron into a sand mold; that the only thing done after the casting process was to cut off the gate with a chisel and to remove the rough corners known as fins which are either knocked off with a hammer or sometimes brushed off with a wire brush; that he never used a pneumatic chip hammer to remove the fins; and that it is the practice in his plant always to remove the sand and dirt from the ingot molds and also the fins.

The Government offered in evidence the testimony of a single witness, Edward Colquitt, United States examiner of merchandise and acting appraiser at Port Huron. He testified that he had examined the merchandise at bar; that he had had 40 years' experience in examining castings of iron; that in that capacity he had been called upon to determine whether or not the castings in question had been machined; that whether or not it had been machined could be told by looking at it; and that upon the merchandise at bar there were marks of some abrasive that were evidences of its having been machined.

On this record we find the following facts:

1. That the merchandise here invoiced as "160 Cast Iron Ingot Moulds not Machined" consisted of rough iron castings.

2. That they contained no trace of vanadium, tungsten, molybdenum, chromium, nickel, or cobalt; that they did contain 0.10 per centum phosphorus, 0.73 per centum of manganese, and 1.24 per centum of silicon.

3. That they were made by pouring molten iron into a sand mold.

4. That upon their removal from the mold nothing was done to them except chiseling off the so-called "gate" and chipping off the

fins, both of which are rough excrescences which adhere as incidents to the casting process, and the removal of sand and dirt.

5. That there was no machine work of any kind applied to said castings.

6. That the castings in question were not malleable castings.

7. That after importation said iron castings were in turn used as molds in the casting of steel ingots.

Upon this record counsel for the Government in his brief filed herein contends that because the merchandise here is used as molds for the manufacture of steel ingots, it is therefore "made up into articles" and as such is expressly excluded from said paragraph 327 of the Tariff Act of 1930. With this contention we do not agree. In our opinion the evidence is uncontradicted that the merchandise herein consists of "castings wholly of cast iron" which have not been advanced beyond the casting stage by any process whatsoever, except such as are incidental to the casting process.

The question of what constitutes a casting in the tariff sense has been the subject of decisions of this court almost from its establishment as the Board of General Appraisers. In the case of *Paul Schlossmann* v. *United States*, T. D. 12814–G. A. 1410, which arose under the Tariff Act of 1890, this court (then the Board of General Appraisers) said:

In some paragraphs of the tariff, it is true, the phraseology gives an effect not intended by Congress, but in this instance we think that the intent of Congress is not expressed in ambiguous language. There is abundant evidence to show, and it is to our personal knowledge, that "iron castings" is a commercial term descriptive of a well-known and easily defined class of merchandise.

Webster makes a distinction between a casting and cast iron. Casting is defined as "that which is cast in a mold, * * * as a casting in iron," and cast iron as "made of cast iron." The trade definition of a casting is the same as that of Webster, but commercially a casting *does not lose its designation as a casting even when its gates and other excrescences have been chipped off and when it has been cleaned, pickled, or rumbled.* In such a condition it is bought, sold, and universally known in trade as a casting. But when a product of a foundry has been finished, or fitted by a machinist into an implement, machine, or part of a machine, it is no longer known technically, popularly, or commercially as a casting, but enters into another class of manufactures of iron.

In the case of *Wilfred Schade & Co. for St. Louis Car Co.* v. *United States*, T. D. 24604–G. A. 5397, 6 Treas. Dec. 675, which arose under the Tariff Act of 1897, Fischer, General Appraiser, held that "A casting is an article which in its imported form is substantially in the condition as it comes from the mold."

In the more recent case of *Herbert Morris (Inc.) et al.* v. *United States*, Abstract 2336, 51 Treas. Dec. 1135, which arose under the Tariff Act of 1922, this court (then the Board of General Appraisers) speaking through General Appraiser Fischer, said:

The testimony showed that the merchandise is rough castings which have been subjected to no process subsequent to that of casting save the mere removal of the rough edges by chiseling, etc.

In that case the articles were assessed with duty at the rate of 30 per centum ad valorem under paragraph 372 of the Tariff Act of 1922 as parts of machines not specially provided for, and were held to be rough castings under paragraph 327 of that act as castings.

Upon the established facts and the law applicable thereto we hold the instant merchandise to be properly dutiable at the rate of 20 per centum ad valorem under the provision in paragraph 327 of the Tariff Act of 1930 for "castings and vessels wholly of cast iron," as alleged by the plaintiff, rather than at the rate of 45 per centum ad valorem under paragraph 397 of said act as manufactures of metal not specially provided for, as classified by the collector. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.