**JOHN V. CARR & SONS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**C.D. 4209, Protest No. 68/33894-8776.**

United States Customs Court,
Second Division.
April 29, 1971.

Honey and Irving Levine, New York City, of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Glenn E. Harris, Velta A. Melnbrencis, Robert E. Burke, New York City), and John A. Gussow, trial attorneys), for defendant.

RAO, Chief Judge:

The substantive issue in this case involves the classification of hub castings, imported from Canada. However, a preliminary issue is raised by the following state of facts:

It appears from the official papers, which are in evidence, that this merchandise was appraised as entered on March 28, 1968 and was liquidated as entered on April 12, 1968. The protest was filed on April 30, 1968, claiming *inter alia*, "that the assessment of the duties made herein is illegal and void."

In its original brief defendant questioned the validity of the liquidation in view of the holding in Pistorino & Co., Inc. v. United States, 65 Cust.Ct. ——, C.D. 4110 (1970), application for rehearing pending, and the court subsequently directed the filing of supplemental briefs.

In the *Pistorino* case it was held that both the appraisement and the liquidation were void where the liquidation occurred before the expiration of the time within which an appeal for reappraisement might be filed.

Plaintiff takes the position in this case that the appraisement is valid but that the liquidation is void. It requests that the protest be dismissed as premature and the district director be directed to proceed with a valid liquidation, but that the court, nevertheless, determine what the proper classification should be.

The Government agrees that the validity of the appraisement was not disturbed by the liquidation. However, it argues that the liquidation is not void but merely voidable and that it has not been

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, E. Thomas

avoided by the filing of an appeal for reappraisement by either party. Alternatively, it is urged that if the liquidation is held void, the proper disposition of the case is to dismiss the protest without deciding the classification issue.

In Pistorino & Co., Inc. v. United States, *supra*, prior to appraisement, plaintiff wrote a letter to the collector advising him that he had made a clerical error in not deducting two nondutiable items and requesting that the "clerical error" be taken into consideration in appraising the merchandise. The merchandise was appraised with no deduction for one of the items. No notice of appraisement was sent. In its protest, as amended, plaintiff claimed clerical error and that the liquidation was illegal, null and void since no notice of appraisement was issued.

The court construed the letter to the collector as a request for a notice of appraisement. It noted, however, that there was no evidence of receipt of the letter by the collector, and that it would have reopened the case for the introduction of further evidence, but for the fact that there was another basis for the final disposition of the case. It stated:

> It is noted that liquidation of the involved entry occurred on November 22, 1965, or just 32 days after the merchandise was appraised. As such, appraisement never became final, the time within which the collector might appeal therefrom not having expired at the time of liquidation. Under 19 U.S.C.A., section 1503(a) the collector has but one value upon which he can lawfully assess duty, and that is the final appraised value of the merchandise which does not become final until the expiration of 60 days after the appraisement. Liquidation of an entry prior to the expiration of the time for appeal to reappraisement is null and void. United States v. Boston Paper Board Co., 23 CCPA 372, T.D. 48233 (1936). And the effect of such premature liquidation is to void the appraisement as there was no official

act of the collector accepting the appraisement. United States v. Boston Paper Board Co., *supra*. Consequently, the matter must be remanded to a single judge of this court, pursuant to 28 U.S.C.A., section 2636(d) to determine the value of the merchandise herein in the manner provided by law.

In the instant case no appeal for reappraisement has been filed by either party; no one is contending for a different appraised value, and both parties agree that the appraisement is valid.

Apropos of the question of the validity of the appraisement we note that section 501(a) of the Tariff Act of 1930, as amended prior to the Customs Courts Act of 1970, provided:

> (a) * * * The decision of the appraiser, including all determinations entering into the same, shall be final and conclusive upon all parties *unless* a written appeal for a reappraisement is filed with or mailed to the United States Customs Court by the Collector within sixty days after the date of the appraiser's report, or filed by the *con*-signee or his agent with the collector within thirty days after the date of personal delivery, or if mailed the date of mailing of written notice of appraisement to the consignee, his agent, or his attorney. * * * [Emphasis supplied.]

In using the word "unless" in the above provision, Congress appears to have intended that an appraisement, valid when made, should be final and conclusive and could be disturbed only by the filing of a timely appeal for reappraisement. A proviso or clause beginning with the word "unless" means an exception or condition subsequent rather than a condition precedent. State Wholesale Grocers v. Great Atlantic & Pacific Tea Company, 7 Cir., 258 F.2d 831 (1958), cert. den. 358 U.S. 947, 79 S.Ct. 353, 3 L.Ed.2d 352 (1958); United States v. Winnicki, 7 Cir., 151 F.2d 56 (1945); In re Wiegand, D.C., 27 F.Supp. 725 (1939).

Thus, a liquidation prior to the expiration of the time within which an

appeal may be filed does not affect the validity of the appraisement. It does not, however, preclude the filing of an appeal by either the importer or the Government within the statutory period, and if such is filed, the appraisement is rendered inconclusive and jurisdiction is vested in the courts to determine value.

In both United States v. Boston Paper Board Co., 23 CCPA 372, T.D. 48233 (1936), relied on in the *Pistorino* case, and Lawrence Groom & Co. v. United States, 64 Treas.Dec. 119, T.D. 46559 (1933), in which the appraisements were held void or inconclusive, appeals were taken within the statutory period, although the liquidation occurred prior to the expiration thereof. In Biddle Purchasing Co., Universal Light Co. v. United States, 69 Treas.Dec. 880, T.D. 48320 (1936), on the other hand, where no appeal was filed, the appraisement was not held void.

■ In our view, since no appeal for reappraisement has been taken in the instant case and the time for such appeal has expired, the appraisement which was valid when made, is final and conclusive on all parties.

■ Is the liquidation which took place before the expiration of the statutory period within which to file an appeal for reappraisement void or voidable?

Obviously, if a timely appeal for reappraisement had been filed, the liquidation herein would have been rendered void. That is the situation which existed in a number of cases where the court has stated that the liquidation is void or that the collector has no power to liquidate while an appeal for reappraisement is pending. Stubbs v. United States, 7 Ct.Cust.App. 399, T.D. 36967 (1917); United States v. Boston Paper Board Co., *supra*; Lawrence Groom & Co. v. United States, *supra*; The New Home Sewing Machine Co. v. United States, 62 Cust.Ct. 895, R.D. 11655 (1969). See also United States v. European Trading Co., 26 CCPA 103, C.A.D. 1 (1938), where liquidation took place

before the time to appeal from a decision of the Customs Court to the Court of Customs and Patent Appeals had expired.

While the word "void" has been applied to the liquidations in some of the decisions, that term is often used to signify various shades of infirmity from absolutely void for all purposes to merely voidable. Joseph Fischer v. United States, 38 CCPA 143, 150, C.A.D. 452 (1951). In that case the court found it significant that prior decisions had held that insufficient designation of packages to be examined rendered an appraisement null and void rather than void *ab initio*. It concluded that the action of the collector in failing to designate the prescribed number of packages "may be characterized as an act which he was empowered to perform but which he performed in an improper manner." It was held that such act, not being void in an absolute sense, did not vitiate the jurisdiction of the court in a reappraisement case.

In the instant case the district director was empowered to liquidate the entry on the basis of the appraised value (absent a timely appeal for reappraisement or a finding of value by the Customs Court or the Court of Customs and Patent Appeals). This he did—the only alleged infirmity being that he did it prior to the expiration of the time during which an appeal might have been filed. The liquidation could have been voided by the filing of a timely appeal by either party. Since in this case none was filed, and the rights of neither party have been prejudiced, the liquidation remains valid.

While it has been customary until recent years to withhold liquidation until the period for appeal has expired, there appears to be no legislative policy in the public interest requiring it. In fact, at the present time there are reasons for the newer procedures.

In a report of the Survey Group which made a management study of the Bureau of Customs, "An Evaluation of: Mission Organization Management", December, 1964, it is pointed out that about 70 per-

cent of all entries are appraised and liquidated as entered and recommendations were made to speed up procedures in such cases so that "no change" entries might be considered liquidated "as entered" without going through the full process of liquidation (pp. VI 46–51).

After the adoption of the Reorganization Plan No. 1 of 1965, 79 Stat. 1317, 89th Cong. 1st Sess. (1965) and the abolition of the offices of collector and appraiser, 100 Treas.Dec. 381, T.D. 56564 (1965), it became the practice of the Bureau of Customs to appraise and liquidate as entered without waiting for the expiration of the appeal period, and to cancel liquidations where appeals were filed, in order to reduce delays without prejudicing the rights of the parties.

We conclude that the appraisement in the instant case is valid; that since no appeal for reappraisement has been filed and the statutory period has expired, it is final and conclusive on all parties; and that while the liquidation was voidable when made, it has not been avoided by the filing of a timely appeal for reappraisement by either party, and consequently it remains valid.

We turn then to the substantive issue.

The merchandise involved in this case was described on the special customs invoice as hubs "for multipurpose cast-iron casting to be used in various machinery which incorporates a planetary axle (not malleable)." It was assessed with duty at 9 per centum ad valorem under item 678.50 of the Tariff Schedules of the United States, as modified by T.D. 68–9, covering machines, not specially provided for, and parts thereof. It is claimed to be dutiable at 2 per centum ad valorem either under item 657.09 of said tariff schedules, as modified, as cast-iron articles, not alloyed and not malleable, or under item 692.24, as modified, as cast-iron (except malleable cast-iron) parts of motor vehicles, not alloyed and not advanced beyond cleaning and machined only for the removal of fins, gates, sprues, and risers or to permit location in finishing machinery.

The pertinent provisions of the tariff schedules, as modified, are as follows:

CLASSIFIED:

*Item 678.50, Tariff Schedules of the United States, as modified by T.D. 68–9:*

"678.50    Machines not specially provided for, and parts
thereof ................................9% ad val."

CLAIMED:

*Schedule 6, Part 4, headnote 1(v), Tariff Schedules of the United States:*

"1.    This part does not cover—

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

(v) articles and parts of articles specifically provided for elsewhere in the schedules."

*Schedule 6, Part 3, Subpart G, headnote 1, and Item 657.09, Tariff Schedules of the United States, as modified by T.D. 68–9:*

"1.    This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

Articles of iron or steel, not coated or plated with precious metal:
Cast-iron articles, not alloyed:

657.09    Not malleable .............................2% ad val."

*Schedule 6, Part 2, headnote 2(a), Tariff Schedules of the United States:*

"2. *Alloys.*—(a) For the purposes of the tariff schedules, alloys are defined and classifiable as hereinafter set forth. Alloys are metallic substances consisting of two or more metals, or of one or more metals and one or more non-metals, intimately united, usually by having been fused together and which may or may not have been dissolved in each other when molten; they include sintered mixtures of metal powders and heterogeneous intimate mixtures obtained by fusion, but do not include substances in which the total weight of the metals does not equal or exceed the total weight of the non-metal components."

*Schedule 6, Part 2, Subpart B, headnote 2(a) and headnote 2(h) (i), Tariff Schedules of the United States:*

"2. *Grades of Iron, Steel, and Ferroalloys.*—For the purposes of the tariff schedules, the following terms have the meanings hereby assigned to them:

(a) *Pig iron (except vanadium or titanium pig iron) and cast iron:* A ferrous product (not including steel, as defined in (g) of this headnote) containing, by weight, 1.9 percent or more of carbon, and which may contain one or more alloy elements within the respective weight limits specified below:

> not over 6 percent manganese,
> not over 15 percent phosphorus,
> not over 8 percent silicon,
> not over 30 percent chromium,
> not over 40 percent tungsten,
> not over 0.1 percent vanadium,
> not over 0.1 percent titanium,
> an aggregate of not over 10 percent of other alloy elements.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

(h) *Alloy iron or steel:* The term '*alloy*' when used as an adjective to designate a type or grade of iron or steel embraces only—

(i) iron which contains one or more of the following elements in the quantity, by weight, respectively indicated:

> over 3.00 percent of manganese, or
> over 5.00 percent of phosphorus, or
> over 5.00 percent of sulphur, or
> over 3.00 percent of silicon, or
> over 0.20 percent of chromium, or
> over 0.10 percent of molybdenum, or
> over 0.30 percent of tungsten, or
> 0.10 percent of vanadium, or
> over 0.60 percent of any other metallic element; and

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*"

ALTERNATIVE CLAIM:

*Item 692.24, Tariff Schedules of the United States, as modified by T.D. 68–9:*

    "Chassis, bodies (including cabs), and parts of the foregoing motor vehicles:

        Bodies (including cabs) and chassis:

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

        Other:

692.24         Cast-iron (except malleable cast-iron) parts, not alloyed and not advanced beyond cleaning, and machined only for the removal of fins, gates, sprues, and risers or to permit location in finishing machinery .....2.% ad val."

———◆———

At the original trial plaintiff called William G. Durance, vice-president in charge of production of Holmes Foundry Ltd., Sarnia, Ontario, producer of the merchandise; Padmanabhan Ashok, metallurgist at Holmes Foundry, and Russell H. Pierce, general superintendent of Rockwell Standard Corporation, a division of North American Rockwell, the importer. Photographs, blueprints, and other documents were received into evidence.

It appears from the testimony that the castings involved herein were produced by Holmes Foundry in accordance with blueprints furnished by Rockwell Standard. After importation, they are machined into finished hubs which are put into an assembled axle, called a planetary axle, which is used to support wheels which move a vehicle.

Mr. Durance described the method of manufacture of the imported castings by Holmes Foundry as follows:

\* \* \* In the inception, we get a drawing or blueprint from the customer, and from this drawing a pattern is made that is a duplicate of the casting we intend to make. The pattern, from the pattern we make a sand mold, and after the pattern is extracted from the mold, we close this mold up, and we pour iron in it. After the iron has solidified and cooled sufficiently to handle, it is then snagged, or the gates and risers and sprues are taken off of it. It is sand blasted. A final inspection is put on it, and it is annealed, and painted, and shipped.

The witness said that sand blasting was done to clean the casting and that the painting was to prevent rust. According to this witness, these hubs were not alloyed and were not malleable nor were they advanced beyond cleaning or machining for the removal of fins, gates, sprues and risers, or to permit location in finishing machinery. He said they were cast hubs, resembling a wheel, or hub, as part of a wheel. The blueprints indicated that they were rough castings which had to be machined after delivery to the customer.

Mr. Ashok described annealing as follows:

Annealing is a heat treatment given to change the structure of the cast iron from one grade to the next. Now, what is done is the casting is kept at a particular temperature for a particular amount of time, very short time. We give about 5½ hours at 1700 degrees centigrade, and all we are trying to do is change the structure from the carbides that may be present in the structure, and pearlites, and we change these carbides and pearlites to ferrites, to produce the specifications they require.

The process of producing malleable iron is different, according to the witness. He said:

\* \* \* It requires heat treating it for a certain amount of time at a certain amount of temperature, for a long length of time, decreasing the temperature, heating it again. It is about an 18 hour cycle. We give a 3 or 4 hours cycle, just for getting better properties.

In his opinion, the castings herein were not malleable.

Mr. Ashok stated that in the regular course of procedure at Holmes Foundry, specimens were taken from the molten metal and analyzed in the laboratory under his supervision. Testifying from casting chemical analysis records of castings produced between March 4 and the date of shipment March 18, 1968 (during which period the instant merchandise was produced), the witness gave the following percentages of the ingredients:

| | |
|---|---|
| Total carbon | 3.40 to 3.80% |
| Silicon | 2.97% |
| Sulphur | .011 to .017% |
| Magnesium | .037 to .061% |
| Manganese | .44% maximum |
| Nickel | (Not added but present in the amount of .44%) |

According to the witness, these percentages were in the tolerances allowed by the customer. He stated further that the castings did not contain over 3% manganese, 5% phosphorous, 5% sulphur, 3% silicon, 0.20% chromium, 0.10% molybdenum, 0.30% tungsten, 0.10% vanadium, 0.60% other metallic elements. While there was no testing for chromium, molybdenum, tungsten, vanadium, or any other metallic element than those stated above, the witness said that those elements are not present in the iron his firm produces.

In his opinion the castings involved herein were not alloyed and were not malleable because the production of malleable iron requires an 18-hour heat treatment cycle to change the structure of the cast iron from one grade to the next, that is, to change the carbides and pearlites to ferrites to produce the required specifications.

Mr. Pierce testified that when the cast hubs produced by Holmes Foundry are received at Rockwell Standard they are first subjected to a turning operation where both inside and outside diameters are turned. Then they are taken to drill presses, where pipe tap holes are placed in the proper position, and then they are put through a burr and wash process. The finished hubs are then put into an assembled axle called a planetary axle.

Mr. Pierce said that his firm sells planetary axles to customers for use in off-the-road construction equipment, such as front end loaders, big mining trucks, loggers, skidders, fork-lift trucks and a wide variety of off-the-road equipment. They could be used in cranes but the witness did not know whether they were. They are used in bulldozers not of the caterpillar type, but not in conveyors.

Subsequent to the hearing some of the exhibits were lost and the case was restored to the docket for substitute evidence. Duplicate copies of exhibits 1 through 6 were received in evidence. In lieu of the original exhibit 7, John S. Blunt, president of Holmes Foundry, Ltd., was called to testify. He stated that he was familiar with the chemical casting analysis records of his company which are presented to him daily. He identified a summary of the chemical analysis for the period March 4 through March 19 prepared under his supervision from the work sheets. It contained only the information relating to the chemical analysis of hub castings, not other castings. In his opinion the specifications therein do not indicate in any way an alloy iron nor that the iron involved was malleable. This sheet was received in evidence as substitute exhibit 7. Two pages which were photostat copies of the worksheets were received in evidence as defendant's exhibit B.

The witness testified that his firm never produced merchandise containing excess of 5% phosphorus. He said the

merchandise probably would contain chromium in the range of 0.08 to 0.12% but not in excess of two-tenths of a percent. There might be faint traces of molybdenum and tungsten, not more than three-tenths of 1 percent. Any elements not shown on exhibit 7 would be present only in trace levels. Exhibit 7 indicates a carbon content ranging from 3.57 to 3.95%, silicon from 2.44 to 2.97%, phosphorus 0.033 to 0.052%, sulphur 0.012 to 0.019%, nickel 0.25 to 0.37%, manganese 0.35 to 0.44%, and magnesium 0.037 to 0.061%.

The primary issue involved herein is whether the imported hub castings are properly classifiable under item 657.09, as cast-iron articles, not alloyed, and not malleable, or under item 678.50, as parts of machines, not specially provided for.

It is clear from the record that these articles are made of cast iron and are not malleable. The Government claims that it has not been established that their alloy composition was within the specific percentage limits set out in headnote 2, schedule 6, part 2B, *supra*, and did not contain an aggregate of over 10 percent of any other nonenumerated alloy elements. In our view the record sufficiently indicates that the principal alloying elements did not exceed the allowable percentages and that any others present were in such small or trace quantities that their aggregate would not amount to over 10 percent of other alloy elements.

It is also clear from the record that in their imported condition these were rough castings, not finished hubs, and were not usable as parts of planetary axles until they had been subjected to several machining operations.

As to the meaning of the term "castings" in tariff statutes, the court said in Joslyn Mfg. & Supply Co. v. United States, 3 Cust.Ct. 49, 53, C.D. 200 (1939):

The question of what constitutes a casting in the tariff sense has been the subject of decisions of this court almost from its establishment as the Board of General Appraisers. In the case of Paul Schlossmann v. United States, T.D. 12841–G.A. 1410, which arose under the Tariff Act of 1890, this court (then the Board of General Appraisers) said:

In some paragraphs of the tariff, it is true, the phraseology gives an effect not intended by Congress, but in this instance we think that the intent of Congress is not expressesd in ambiguous language. There is abundant evidence to show, and it is to our personal knowledge, that "iron castings" is a commercial term descriptive of a well-known and easily defined class of merchandise.

Webster makes a distinction between a casting and cast iron. Casting is defined as "that which is cast in a mold, * * * as a casting in iron," and cast iron as "made of cast iron." The trade definition of a casting is the same as that of Webster, but commercially a casting *does not lose its designation as a casting even when its gates and other excrescences have been chipped off and when it has been cleaned, pickled, or rumbled.* In such a condition it is bought, sold, and universally known in trade as a casting. But when a product of a foundry has been finished, or fitted by a machinist into an implement, machine, or part of a machine, it is no longer known technically, popularly, or commercially as a casting, but enters into another class of manufactures of iron. [Emphasis quoted.]

See also Wilfred Schade & Co., for St. Louis Car Co. v. United States, 6 Treas. Dec. 675, T.D. 24604 (1903), and Herbert Morris (Inc.) et al. v. United States, 51 Treas.Dec. 1135, Abstract 2336 (1927).

The Tariff Act of 1930, the predecessor of the present tariff statute, provided in paragraph 327 for "castings and vessels wholly of cast iron, including all castings of iron or cast-iron plates which have been chiseled, drilled, machined, or

otherwise advanced in condition by processes or operations subsequent to the casting process but not made up into articles, or parts thereof, or finished machine parts * * *." Under that act it was held that rough unmachined castings of iron with nothing done to them after they had left the foundry except the removal of gates, burrs, and other excrescences, were classifiable as castings of iron, rather than as parts of machines, not specially provided for, under paragraph 372. United States v. Singer Manufacturing Company, 37 CCPA 104, C.A.D. 427 (1950).

In the course of the opinion in that case the court said (pp. 107, 108):

> We doubt if castings of iron are ever made without a predetermined ultimate use which determines the form in which the castings are made. While the castings here involved were cast into form so as to be ultimately used as parts of a power transmitter or power table, they have not been advanced in manufacture after being cast. They were imported in the condition in which they left the foundry, nothing having been done to them after they were cast except the removal of gates, burrs, and other excrescences. * * *

It seems clear to us that the first provision of paragraph 327, *supra*, above referred to, to wit: "castings and vessels wholly of cast iron," covers castings of iron as they first arrive in commerce in their rough cast condition as they come from the foundry, and that the second provision above referred to includes castings of iron which have been "advanced in condition by processes or operations subsequent to the casting process" provided they were "not made up into articles, or parts thereof, or finished machine parts."

The provision for excluding "finished machine parts" convinces us that castings of iron which might be regarded as unfinished machine parts are within the paragraph provided they are not made up into articles or parts therof.

* * * * * *

As above stated, the involved castings are not "finished machine parts" and paragraph 327, *supra*, excludes machine parts from its provisions only if they are "finished machine parts." The provisions of paragraph 372 *supra*, include "parts" of machines, "not specially provided for." The question then is "are the castings specially provided for in some paragraph other than 372?" We think they are specially provided for in paragraph 327, *supra*. They are castings of iron; they have not been advanced in condition subsequent to the casting process so as to be made up into articles, or parts thereof, or into finished parts. An examination of the exhibits (samples of the articles as imported) clearly shows that the castings in their imported condition are not capable of being used as parts of a power transmitter or power table.

See also Ford Motor Company v. United States, 27 Cust.Ct. 22, C.D. 1342 (1951), where it was held that castings designed to become manifold and transmission cases of automobiles or industrial engines after being properly machined were held classifiable under paragraph 372 as castings of iron rather than under paragraph 369(c), as parts of automobiles, finished or unfinished.

The tariff schedules originally proposed to include under the superior heading, "Articles of iron or steel, not coated or plated with precious metal," separate items for "Forgings, not machined, tooled, or otherwise processed after forging," "Castings of malleable iron", and "Other articles." According to the Tariff Classification Study of November 15, 1960, the provision for rough forgings was derived from paragraph 319(a) and that for castings of malleable iron from paragraph 327, without significant rate changes. (Schedule 6, p. 204.) The provision for forgings was later transferred to Schedule 6, part 2B (First Supplemental Report, pp. 48, 61)

and a provision for cast-iron articles, not malleable, added (Third Supplemental Report, p. 52). The rates proposed for malleable and non-malleable castings were those in trade agreements supplementary to the General Agreement on Tariffs and Trade, 98 Treas.Dec. 51, 112, T.D. 55816. It would appear, therefore, that it was the understanding of the drafters that the provisions for cast-iron articles, not alloyed, non-malleable, in the tariff schedules covered merchandise formerly classifiable as castings of iron under paragraph 327. Cf. United States v. Andrew Fisher Cycle Co., Inc., 426 F.2d 1308, 57 CCPA 102, C.A.D. 986 (1970).

The proper classification of forgings under the tariff schedules was before the court in United States v. J. Gerber & Co., Inc. et al., 436 F.2d 1390, 58 CCPA, C.A.D. 1013 (1971). The merchandise there consisted of forgings in the shape of pipe or tube flanges, dedicated to use as flanges for pipes or tubes. They were classified as pipe or tube fittings and were claimed to be forgings, not machined, not tooled, and not otherwise processed after forging. In the course of the opinion the court made reference to General Interpretative Rule 10(h) which provides that unless the context requires otherwise a tariff designation of an article includes such article whether finished or not finished. It found that the merchandise before it had been classified as unfinished pipe or tube fittings but held that the rule did not require that result when the articles were also forgings. In the course of the opinion, the court discussed the legislative history of the provisions for forgings in prior tariff acts and cited United States v. Singer Manufacturing Company, *supra*, which it said indicated the proper principles, even though it dealt with iron castings, not forgings. The court concluded:

> We agree with the trial court that the phrase in General Interpretative Rule 10(h) "unless the context requires otherwise" is meant to withdraw the Rule from operation wherever classification of an unfinished article under the provision for the completed article would come into conflict with any express declarations of Congress elsewhere set forth, that require otherwise. Thus the rule might be effective to save an unfinished article from being classified under a mere basket item written from a horror of leaving any import unprovided for, but it is ineffective by its own terms against a specific provision that implements a policy of Congress, consciously arrived at and clearly stated. Congress has historically wanted forgings to be classed and dealt with as forgings, and has put into the new schedules nothing to state a contrary intention now.

■ The same line of reasoning is applicable here, namely, that Congress has historically wanted castings to be classed and dealt with as castings and the new schedules do not indicate a contrary intention.

Defendant urges that under General Interpretative Rule 10(ij) a provision for "parts" of an article covers products solely or chiefly used as parts of such article unless there is a specific provision for such part. It is defendant's contention that since item 657.09 appears in schedule 6, part 3G, which covers only articles of metal which are not more specially provided for elsewhere, it is a "basket" or "not specially provided for" provision, not a specific provision for a part such as is contemplated by Rule 10(ij). It is therefore claimed that these castings were properly classified as unfinished machine parts.

The superior headings in subpart G are all couched in general terms, and cover articles of various metals. The superior heading to item 657.09 covers "Articles of iron or steel, not coated or plated with precious metal" and an inferior heading covers "Cast-iron articles, not alloyed." The designation "castings" refers to articles in a particular condition—as they come from the mold with only excrescences removed. An early provision therefor

has been construed as a special provision for castings of iron in rough condition, excluding them from coverage as parts of machines, not specially provided for. United States v. Singer Manufacturing Co., *supra*. We do not think the provisions of the tariff schedules, including Rule 10(ij), compel a different conclusion, particularly in view of the long standing intent of Congress to classify castings as castings. It is evident that castings are cast-iron articles. Whether or not the tariff schedules provision for cast-iron articles includes more than castings need not be considered here.

■ Plaintiff's alternate claim for classification under item 692.24 as cast-iron parts of motor vehicles is untenable. The superior heading to item 692.24 covers "Chassis, bodies (including cabs), and parts of the foregoing motor vehicles." The foregoing motor vehicles are motor vehicles for the transport of persons or articles and those specially constructed and equipped to perform special services or functions, such as fire engines, mobile cranes, wreckers, concrete mixers, and mobile clinics. The most that the record in the instant case establishes is that these hub castings are assembled into planetary axles which are used in off-the-road construction equipment, such as fork-lift trucks, mining trucks, loggers, and skidders. At least some of those articles are covered by item 692.40 which includes fork-lift trucks, platform trucks and other self-propelled work trucks. Parts of the latter could not be covered by the provision in item 692.24. The evidence does not establish in which category of motor vehicle these hub castings are chiefly used.

For the reasons stated, we hold that the merchandise involved herein is properly dutiable at 2 per centum ad valorem under item 657.09 of the tariff schedules, as modified, as cast-iron articles, not alloyed and not malleable. To that extent the protest is sustained and judgment will be entered for the plaintiff. As to all other claims, the protest is overruled.