(C.D. 4302)

Associated Hobby Mfrs., Inc. *v.* United States

United States Customs Court, First Division

(Decided December 7, 1971)

*Allerton deC. Tompkins* for the plaintiff.
*L. Patrick Gray, III*, Assistant Attorney General (*Joseph I. Liebman* and *Andrew P. Vance*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case involves the proper tariff classification of eight sets of miniature figures with accompanying auxiliary items. The sets were described on the invoices as construction kits and were imported at Philadelphia from England in 1968. Upon entry they were classified by the government under item 737.40 of the tariff schedules,

as modified, T.D. 68–9, as other toy figures of animate objects (except dolls), not having a spring mechanism, and not stuffed, and assessed duty at the rate of 31 percent.[1]

Plaintiff claims the importations should be classified under item 737.09 which covers "[c]onstruction kits or sets with construction units prefabricated to precise scale of the actual article" and provides for duty of 17 percent. Alternatively it claims that the imports are dutiable as articles of plastic, not specially provided for, under item 774.60, at the rate of 15 percent.

The government alternatively claims that if its classification is erroneous, the correct classification is under item 737.90 as other toys not specially provided for, not having a spring mechanism, at the rate of 31 percent. It further contends that in the event the court should find that the importations are construction sets within the meaning of the tariff schedules, the proper provision for classification would be item 737.15 which covers other construction kits or sets at the rate of 31 percent.

The relevant provisions of the tariff schedules are as follows:
Schedule 7, Part 5, Subpart E

Subpart E headnotes:

1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules * * *—

*    *    *    *    *    *    *

2. For the purposes of the tariff schedules, a "toy" is an article chiefly used for the amusement of children or adults.

---

Model trains, model airplanes, model boats, and other model articles, all the foregoing whether or not toys; and construction kits or sets for making or assembling such model articles:

| | | |
|---|---|---|
| 737.05 | Models of inventions and of other improvements in the arts, to be used exclusively as models_____ | Free |
| | Other models, and construction kits or sets: | |

---

[1] The entries were liquidated within 60 days from the date of appraisement. However, since no appeal for reappraisement was filed within the statutory period, the liquidations, in our view, remain valid. *John V. Carr & Son, Inc.* v. *United States*, 66 Cust. Ct. 316, C.D. 4209, 326 F. Supp. 973 (1971). See also *Pistorino & Co., Inc.* v. *United States*, 67 Cust. Ct. 245, C.D. 4281 (1971) (decided on rehearing).

| | | |
|---|---|---|
| 737.07 | Rail locomotives and rail vehicles; railroad and railway rolling stock; track, including switching track; rail depots, round houses, signal towers, water towers, and other trackside structures; trolley buses and trolley-bus systems; cable-car systems; highway vehicles; ships and harbor structures; and airplanes and spacecraft; all the foregoing made to scale of the actual article at the ratio of 1 to 85 or smaller _____ | 14% ad val. |
| 737.09 | Construction kits or sets with construction units prefabricated to precise scale of the actual article_____ | 17% ad val. |
| 737.15 | Other _____ | 31% ad val. |
| * | * * * * * | * * |
| | Toy figures of animate objects (except dolls): Not having a spring mechanism: | |
| | * * * * * | * * |
| | Not stuffed: | |
| | * * * * * | * * |
| 737.40 | Other _____ | 31% ad val. |
| | * * * * * | * * |
| | Toys, and parts of toys, not specially provided for: | |
| | * * * * * | * * |
| 737.90 | Other _____ | 31% ad val. |

Schedule 7, Part 12, Subpart D

| | | |
|---|---|---|
| | Articles not specially provided for, of rubber or plastics: | |
| | * * * * * | * * |
| 774.60 | Other _____ | 15% ad val. |

Turning now to the record, plaintiff's exhibits 1 through 8 are sample sets representing the imported merchandise. Each is imported in a cardboard box that has a cellophane see-through window on one side and multicolored illustrations on the front and back. A brief description of each follows.

Exhibit 1, identified as the "Guards Band," has on the front of the cardboard box an illustration of five marching bandsmen of the British Guard's Band dressed in ceremonial uniform. On the back of the box is an illustration of the band leader, and next to that a statement that "[t]his set consists of 44 HO and OO scale figures, suitable for use with the Airfix HO & OO Trackside series, and are completely finished with the exception of painting." The contents of the box consist of 44 minia-

ture figures of uniformed musicians playing various musical instruments.[2] These figures are complete except for the drummers for whom eight miniature drums are included—each of which can be snapped into place on the appropriate drummer figure.

Exhibit 2, identified as the "Guards Colour Party," has on the front of the cardboard box an illustration of British soldiers on guard duty. On the back is another illustration of a member of the guard, and next to that a statement that "[t]his set consists of 42 HO & OO scale figures, suitable for use with the Airfix HO & OO Trackside Series, and are completely finished with the exception of painting." The contents of the box consist of 40 complete figures of walking uniformed British guards with rifles (one with a flag) and two two-piece, snap-together miniature sentry boxes.

Exhibit 3, the "Wagon Train," contains on the front of the box an illustration of a western wagon train and on the back four illustrations in outline form of some of the figures contained inside. Beneath these illustrations are "General Assembly Instructions" which read:

> Remove all pieces from sprue. To ensure a clean painting surface it is advisable to wash with detergent before painting. Paint individual parts first, then where applicable, as shown in illustrations above, clip, place or glue figures, horses or equipment in position on bases. For painting use Airfix paints. For fixing to a base, if desired, use Bostik or a similar adhesive.

The contents are made up of 46 pieces as follows: 19 figures of men and women in period dress; 5 horses (four with connectors for attachment to a wagon); a wagon in knocked-down condition, consisting of four wheels, a chassis, three undercarriage mounts, and a top; and miscellaneous pieces such as guns, trunks, sacks of flour, pots, pans, etc.

Exhibit 4, identified as "U.S. Marines," contains on the front of the box an illustration of Marines landing on a beachhead, and on the back three illustrations in outline form of the figures contained inside. Beneath these illustrations are printed the same "General Assembly Instructions" as appear in exhibit 3. The set consists of 46 pieces, 44 of which are miniature figures of Marines in various positions with bazookas, rifles, etc. Also contained in the set is a two-piece, snap-together miniature landing raft.

Exhibit 5, identified as the "Russian Infantry," contains on the front of the box an illustration of Russian soldiers in a war scene, and on the back two illustrations in outline form of the figures contained inside. Beneath these illustrations are printed the same "General Assembly Instructions" as appear in exhibits 3 and 4. The set consists of 48 pieces, 42 of which are miniature figures of Russian soldiers in

---

[2] As imported, the individual pieces contained in each set are attached in groups of 9 to 13 to a plastic bar called a "sprue."

different positions, while the remaining pieces are such objects as bases, guns, a gun carriage, and a mortar.

Exhibit 6, identified as the "Japanese Infantry," contains on the front of the box an illustration of Japanese soldiers charging ahead in combat in a tropical setting. On the back are illustrations in outline form of the figures contained inside. Beneath these illustrations are printed the same "General Assembly Instructions" as appear in exhibits 3, 4 and 5. The set consists of 48 pieces, all of which are miniature figures of Japanese soldiers in various positions carrying flags, rifles, etc.

Exhibit 7, identified as the "U.S. Cavalry," contains on the front of the box an illustration of the U.S. Cavalry fighting Indians. On the back are illustrations in outline form of various figures and the same "General Assembly Instructions" as appear in exhibits 3 through 6. The set consists of 36 pieces as follows: 12 miniature figures of cavalrymen, each with legs astride for mounting a horse; 12 miniature figures of horses; and 12 bases on which the horses can be mounted.

Exhibit 8, identified as "Paratroopers," contains on the front of the box an illustration of a paratroop combat scene. On the back are illustrations in outline form of various figures and the same "General Assembly Instructions" as appear in exhibits 3 through 7. The set consists of 41 pieces, 33 of which are miniature figures of paratroopers in uniform holding various firearms. The remaining pieces consist of bases, parachutes, a box, a bazooka gun in two parts, etc.

Two witnesses testified at trial—one for plaintiff and one for defendant. Appearing on behalf of plaintiff was its president, while a buyer for the art and hobby shop of a large Philadelphia department store was called by defendant. Plaintiff's witness testified that his company was the largest importer of hobby merchandise in the United States; that the importations are invoiced and bought and sold as "construction kits" and are so known in the trade; that they are composed of polyethylene plastics; that they are "construction kits on the sprue [3] from which a model builder can assemble a detailed * * * exact replica of real things for incorporation in other things, in HO layouts or for use in war games or battle scenes, or for collectors"; that each of the various minatures contained in the sets was designed to be constructed into a model of an "actual" thing; and that most of the figures in the sets are complete and do not require that anything be attached to them. He testified that in order to put the kits in final form, the flash must be removed from the figures, the items painted and cut

---

[3] The sprue is important, according to the witness, because it enables one to handle the individual pieces for painting ; for removing flash (i.e., bits of superfluous plastic that have adhered to the forms during molding) ; and for pairing and locating certain figures and keeping them in order for use.

free from the sprue, and in some instances mounted and put together. The witness further testified that the sets are made as precisely to HO scale, which is in the ratio of 87 to 1, as present-day technology makes possible. He added in this connection that the figures represent real people and that it is of vital concern that they be accurate in scale since that was a major reason why consumers bought the articles. Accordingly, the Japanese figures, as an example, were stated to be slightly smaller than the American figures.

Defendant's witness has been in the hobby line for 16 years and has bought, sold, priced and displayed hobby merchandise, as well as having trained sales personnel in the hobby line. She belongs to the Hobby Industry Association as a retail member and attends trade and hobby shows both abroad and in the United States. The witness testified that construction kits generally have instruction sheets which are diagramed and contain word explanations of how to assemble the final product. The witness further testified that some construction kits have small figures in them which are accessories to the main object of attention. She stated that an essential characteristic of construction kits is that they consist of parts which, when assembled, form a complete unit and that, in her opinion, the importations are not construction kits because there is nothing in them to build. She conceded on cross-examination that she never had purchased, displayed or sold any of the kits involved here or constructed anything out of them. She said that she probably has seen the kits on display three times.

Turning now to the legal aspects, it is elementary that in order to prevail, plaintiff had the twofold burden of proving that the government's classification is erroneous and establishing the correctness of its own affirmative claim. E.g., *Joseph E. Seagram & Sons, Inc.* v. *United States*, 30 CCPA 150, 157, C.A.D. 227 (1943). In the present case, we need not consider whether or not that classification is erroneous. For on the record before us, we must conclude that plaintiff has failed to establish either of its affirmative claims under item 737.09 or item 774.60.

Item 737.09, as previously indicated, covers "[c]onstruction kits or sets with construction units prefabricated to precise scale of the actual article." For the reasons that follow, we do not think that the imports are "construction kits or sets" within the common meaning of this provision. Referring first to lexicographic sources, the following definitions are pertinent:

> *Webster's Third New International Dictionary of the English Language* (1966)—
> construction * * * 2a: the act of putting parts together to form a complete integrated object * * *.

*Funk & Wagnalls New "Standard" Dictionary of the English Language* (1952) —

construction 1. The act of constructing; also that which is constructed * * *.

construct 1. To adjust and join the materials or parts of so as to form a permanent whole; build, as to *construct* a ship. [Emphasis in original.]

*The Random House Dictionary of the English Language* (1969) —

construct v.t. 1. to form by putting together parts; build; frame; devise.

construction 1. the act or art of constructing.

Also pertinent is the *First Supplemental Report* to the *Tariff Classification Study* (1962), p. 81, where the following explanation was given for adding the word "[c]onstruction" before the words "[k]its or sets" in item 737.09:

> The added word is to insure that the provision will apply to construction kits or sets for making or assembling model articles and will not be interpreted to apply to articles such as so-called model train sets consisting of complete locomotives, passenger cars, freight cars, etc.

It is in this context that as enacted the superior heading to item 737.09 (quoted previously) specifically limits the applicability of item 737.09 to "construction kits or sets for making or assembling * * * model articles."

From all the foregoing, it follows that the term "construction kits or sets" refers to those kits or sets which consist of parts or units for making or assembling model articles; the term does not refer to kits or sets of complete articles.

Viewed in this light, it is apparent that save for the wagon in the "wagon train" set (plaintiff's exhibit 3)[4] and a few other *de minimis* exceptions, the importations do not consist of parts or units for making or assembling complete articles.[5] To the contrary, the record—including in particular an examination of the samples—makes it plain that the importations consist rather of complete miniature figures with respect to which no assembly whatever is needed or suitable. As plaintiff's witness testified "[t]he majority of them [the figures in the kits] are complete * * *." It is true that the figures are designed to be painted, separated from the sprue and have the flash removed. But this does not involve construction—i.e., the assembly or building of objects. It is also true that the record indicates that the importations are invoiced and

---

[4] As for this set, the wagon, at best, would comprise considerably less than one-half of the total set—in which circumstance the set as a whole would be more than a construction set.

[5] It is to be noted that none of the imported sets has any instructional material for making or assembling articles.

bought and sold as "construction kits." However, such merchandising practices, while relevant, are not conclusive as to what the imports are for tariff classification purposes. E.g., *Davis Products, Inc.* v. *United States*, 59 Cust. Ct. 226, 230–31, C.D. 3127 (1967); *International Customs Service, Inc.* v. *United States*, 62 Cust. Ct. 653, 658, C.D. 3843 (1969); *The Spesco Corporation* v. *United States*, 62 Cust. Ct. 297, 303, C.D. 3749 (1969).

Also militating against classification of the imports as "construction kits or sets with construction units prefabricated to precise scale of the actual article" is that plaintiff failed to establish that the imported articles were, in fact, made to the "precise scale" of the actual articles. Indeed, examination of the samples indicates to the contrary. For example, checking a few of the samples, the Japanese infantrymen in plaintiff's exhibit 6 measure approximately 15/16th of an inch—which would mean that at the HO scale of 87 : 1 the actual Japanese infantrymen so depicted would be 6'9½'' tall! And although plaintiff's witness testified that the Japanese figures were slightly smaller than the American figures, many of the American paratroop figures in plaintiff's exhibit 8, as illustrated, likewise measure 15/16th of an inch, thus depicting American paratroopers of the same height as the Japanese infantrymen, i.e., 6'9½''.

Nor has plaintiff established that the imports are properly classifiable under item 774.60 as articles, not specially provided for, of plastics. Under headnote 1, schedule 7, part 5, subpart E of the tariff schedules, toy articles are to be classified in the toy provisions even if they are more specifically provided for elsewhere in the tariff schedules. Therefore, even if it were to be assumed *arguendo* that the imports were erroneously classified under item 737.40 as toy figures of animate objects, if the imports are toys, they would still be classifiable under item 737.90 as other toys, not specially provided for, as alternatively claimed by defendant, rather than under item 774.60 as articles, not specially provided for, of plastic. And in this connection, the government, in pressing its alternative claim under item 737.90, is entitled by reason of its original classification under item 737.40 to rely on the presumption that the imports are "toys." As our appellate court stated in *United States* v. *New York Merchandise Co., Inc.*, 58 CCPA 53, 58, C.A.D. 1004 (1970) : "* * * the original classification required a finding that the subject articles were, *inter alia*, 'toys'. When the government asserted the broader provision, covering toys, in general, as an alternative to the original classification, it * * * [was] permitted to rely on the presumption of correctness attaching to that subsidiary finding of the Collector. The burden of proving the contrary, therefore was on the importer * * *." And this burden plaintiff in the present case has not attempted to overcome. In fact, if anything, the testimony

of plaintiff's one witness would tend to indicate that the importations are chiefly used for fun or amusement. Thus, he testified (R. 55-56) :

> The *fun* is in painting them, the *fun* is in constructing them, the *fun* is in putting them together in a realistic scene, and the *fun* is even in using them afterwards for diorama scenes or for war games. [Emphasis added.]

The protest is overruled. Judgment will be entered accordingly.