(C.D. 4428)

DAVIES, TURNER & Co. *v.* UNITED STATES

UNITED STATES CUSTOMS COURT, First Division

(Decided May 30, 1973)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff. *Harlington Wood, Jr.,* Assistant Attorney General (*Andrew P. Vance* and *Joseph I. Liebman,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: The merchandise in these three consolidated protests involves: (1) "Airfix" plastic construction kits for assembly

into scale models of airplanes, footbridges and traveling cranes; (2) "Airfix" figures on sprues [1] consisting of miniature military figures, farm animals and other animate and inanimate objects; and (3) "Minitank" vehicles and "Minitank" figures consisting of assembled miniature replicas of various types of military vehicles, weapons and combatants. The articles—all of which were built to scale—were imported from England and Austria and entered at the port of Philadelphia during the period from 1960 to 1962. All the importations were classified by the government as other toys, not specially provided for, under paragraph 1513 of the Tariff Act of 1930, as modified by T.D. 52739, and assessed with duty at the rate of 35 percent ad valorem. [2]

Plaintiff claims alternatively that the imported merchandise should be classified under one or more of the following provisions of the Tariff Act of 1930:

(1) paragraph 1539(b), as modified by T.D. 54108, at the rate of 21¢ per pound plus 17 percent ad valorem; [3]

(2) by similitude under paragraph 1559(a), as amended by the Customs Simplification Act of 1954, T.D. 53582, [4] at the modified rates

---

[1] Sprues are plastic strips which are formed by excess plastic when the figures are molded; they connect the various figures to each other in a continuous row and are important in facilitating handling when the figures are painted and finished. See *Associated Hobby Mfrs., Inc.* v. *United States*, 67 Cust. Ct. 391, note 3, C.D. 4302 (1971), *aff'd Id.* v. *Id.*, 60 CCPA 121, C.A.D. 1093 (1973).

[2] Paragraph 1513 of the Tariff Act of 1930, as thus modified, reads in part:
Toys, not specially provided for:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Other * * *_____ 35% ad val.

The term "toy" is defined in paragraph 1513 as:
* * * an article chiefly used for the amusement of children, whether or not also suitable for physical exercise or for mental development. The rates provided for in this paragraph shall apply to articles enumerated or described herein, whether or not more specially provided for elsewhere in this Act.

[3] Paragraph 1539(b) of the Tariff Act of 1930, as modified, reads in part:

Manufactures wholly or in chief value of any product described in the preceding item 1539(b), or of any other product of which any synthetic resin or resin-like substance is the chief binding agent_____ 21¢ per lb. and 17% ad val.

[4] Paragraph 1559(a) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1954, reads:
Each and every imported article, not enumerated in this Act, which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; and if any nonenumerated article equally resembles in that particular two or more enumerated articles on which different rates of duty are chargeable, it shall be subject to the rate of duty applicable to that one of such two or more articles which it most resembles in respect of the materials of which it is composed.

applicable to articles in chief value of:

| Material | Tariff Paragraph | Modified Rate |
|---|---|---|
| Iron, Steel, Brass, Aluminum | 397 [5] | 19% |
| Lead | 397 [6] | See note 6 |
| Wood | 412 [7] | 16 2/3% |

(3) paragraph 1558 as modified by T.D. 52739 [8] providing for nonenumerated articles at the rate of 10 percent.

While plaintiff presses all the foregoing alternative claims, its primary claims are as follows (brief, p. 2) : [9]

| Item | Paragraph of Tariff Act | Rate |
|---|---|---|
| Airfix airplane kits | 1559(a) and 412 | 16⅔% |
| Airfix footbridge kits | 1559(a) and 412 | 16⅔% |
| Airfix traveling crane | 1559(a) and 397 | 19% |
| Airfix figures | 1539(b) | 21¢ per lb. plus 17% |
| Minitank vehicles and figures | 1559(a) and 397 (Lead) | See note 6 |

In essence, the present case is a retrial of *Davies, Turner & Co.* v. *United States*, 61 Cust. Ct. 311, C.D. 3621, 292 F. Supp. 722 (1968), the record in which has been incorporated here. As in the prior case,

[5] Paragraph 397 of the Tariff Act of 1930, as modified by T.D. 54108, reads in part: Articles or wares not specially provided for, whether partly or wholly manufactured:

| \* | \* | \* | \* | \* | \* | \* |
|---|---|---|---|---|---|---|

Other, composed wholly or in chief value of iron, steel, brass \* \* \* or aluminum \* \* \*_____ 19% ad val.

[6] Paragraph 397, as modified by T.D. 53865, reads in part: Articles or wares not specially provided for, composed wholly or in chief value of lead \* \* \* whether partly or wholly manufactured _____ 1½¢ per lb., but not less than 11¼% nor more than 22½% ad val.

[7] Paragraph 412 of the Tariff Act of 1930, as modified by T.D. 52373, reads in part: Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for:

| \* | \* | \* | \* | \* | \* | \* |
|---|---|---|---|---|---|---|

Other (except \* \* \*)_____ 16⅔% ad val.

[8] Paragraph 1558 of the Tariff Act of 1930, as modified, reads in part: Articles manufactured, in whole or in part, not specially provided for \* \* \*_____ 10% ad val.

[9] In addition, plaintiff made claims either directly or by similitude under paragraphs 353, 372, 1413 and 41; however, no proof was offered at trial nor argument made in plaintiff's brief in support of these claims and such claims are therefore dismissed for failure to prosecute. See e.g., *J. E. Bernard & Co., Inc.* v. *United States,* 55 Cust. Ct. 17, 18, C.D. 2549 (1965), *aff'd* 53 CCPA 116, 118, C.A.D. 886 (1966).

one of the basic issues is whether or not the importations were properly classified as toys, i.e., articles chiefly used for the amusement of children.[10] In the incorporated case, the court found it unnecessary to reach that issue since the plaintiff had failed to prove any of its affirmative claims. In the present case, plaintiff has presented additional evidence showing the component materials out of which the imported articles were made, thus remedying the previous deficiencies in proof with respect to its affirmative claims. Hence in the present case, the problem is to determine whether or not the government correctly classified the imported articles as toys.

## The Record

The record consists of the oral testimony of two witnesses for the plaintiff, samples of the imported merchandise, two laboratory reports and two commissions. Also comprising part of the present record is the record in the incorporated case which consisted of numerous exhibits and the testimony of more than one hundred witnesses, including importers, wholesale and retail distributors, adult hobbyists, children and psychologists—all of whom testified as to the chief use of the imported merchandise.

## Plaintiff's Witnesses

In the incorporated case, 54 witnesses appeared on behalf of the plaintiff, and in the present case two witnesses—one of whom had appeared in the incorporated case—testified on its behalf. These 55 witnesses fell into three categories: commercial witnesses; hobbyists; and a psychologist.

## I

### Plaintiff's Commercial Witnesses

In order to establish that the articles in issue were chiefly used by adults rather than children and were thus not toys within the purview of paragraph 1513, plaintiff relied on the testimony of 18 commercial witnesses, 13 of whom were retail merchants, two were officers of the importing concern, and three were representatives of the manufacturer. The testimony of these witnesses indicated, among other things, that the greatest percentage of retail sales of the imports in question was made to adults. For example, it was testified that a hobby shop in White Plains, New York, sold 95 percent of its Airfix construction

---

[10] Under settled judicial construction, the word "children", as employed in the statutory definition of the term "toy" in paragraph 1513 of the Tariff Act of 1930, means boys below the age of 14 and girls below the age of 12. *Davis Products, Inc.* v. *United States,* 60 Cust. Ct. 68, 70–71, C.D. 3262, 279 F. Supp. 448, 449 (1968) ; *United States* v. *Abercrombie & Fitch Co.,* 20 CCPA 267, 271, T.D. 46060 (1932) ; *United States* v. *Harry Grunberg,* 41 CCPA 1, 3–4, C.A.D. 520 (1953).

kits to adults; in Claremont, California, 90 percent of a store's Mini-tanks were sold to adults; a Chicago hobby, toy and sporting goods store sold 90 percent of its Airfix kits, Airfix figures and Minitanks to adults; a hobby shop in Elizabeth, New Jersey, sold over 80 percent of its Airfix figures and Minitanks to persons over the age of 13; a hobby shop in Irvington, New Jersey, sold 90 percent of its Airfix kits, 70 percent of its Airfix figures and 75 percent of its Minitanks to adults; in Morristown, New Jersey, a hobby section of a toy store sold 60 percent of its Airfix figures and Minitanks to teen-agers and adults; and a hobby store in East Meadow, New York, sold 80 percent of this type of merchandise to teen-agers and adults. Further, a Los Angeles whole-sale distributor estimated that 80 percent of the Airfix kits he sold were used by adults.

The commercial witnesses also testified that the imported articles were not suitable for use by children for one or more of the following reasons: they were too fragile for children to play with without destroying them; were too small for children to use and got lost too easily; required manual dexterity and patience which children lacked; and required the use of dangerous tools.

Evidence was also received regarding the retail price of the various importations. Thus, the Airfix kits in controversy sold for 79 cents a box; the Airfix figures sold for a price ranging between 25 cents and 50 cents a box; the Minitanks retailed at a price between 25 cents and $1.00 a box; and the Minitank figures sold for 25 cents a box.

Two commercial witnesses presented by plaintiff were officers of Associated Hobby Manufacturers, Inc. (hereafter referred to as "Associated"), which is a company that designs, develops, buys and sells hobby-craft products and was the importer and ultimate consignee of the importations in question. One of these witnesses, Bernard Paul, president of Associated, testified that he started building models at the age of 13; that he was a frequent winner of model airplane contests; and that such contests do not have participants under the age of 12.

Paul distinguished the "hobby trade" from the "toy trade" on the basis of different buyers and different seasons. For example, the witness referred to his company's contracts with Sears Roebuck under which purchases from Associated were assertedly made by the hobby buyer of Sears' toy department. According to Paul, Associated's contract with Sears precluded Associated and its wholesale distributors from supplying toy items to Sears.[11] In fact, Paul stated, if Associated or its wholesale distributors were to supply toy items to Sears,

---

[11] The witness Paul testified that in addition to being president of Associated, he was also the president of a number of its wholesale distributors, including B. Paul Model Distributors of Philadelphia, Pennsylvania.

it would lose the Sears account. Subject to the same conditions, according to Paul, were Associated's contracts with J. C. Penney, Montgomery Ward, F. W. Woolworth, Neisner Bros., McCrory's, McClellan Corporation, Fisher-Beer Company, J. J. Newberry and S. S. Kresge.

Paul further testified that all of the imported models were made either to HO scale (a ratio of 87:1) or to 00 scale (a ratio of 72:1) and that the two scales were so close in proportion that they were used interchangeably by hobbyists. In an attempt to distinguish hobby articles from toys, Paul pointed out that in contrast to toys, hobby merchandise was superior in scale, detail and workmanship. He further stated that 95 percent of the imported merchandise was sold to hobby trade stores and that with a minor exception was advertised exclusively in hobby trade magazines. Finally, he testified that Airfix Industries, a British firm, manufactured and supplied the majority of the imported items, and characterized it as the largest producer of hobby items in Europe.

The second witness employed by Associated was Nicholas Pfusterschmid, the company's general manager. He testified that the imported articles were difficult to construct because the parts were small and thus could not be handled by children; they required the use of knives or razor blades for cutting the pieces from the sprue; the construction required "quiet hands" to glue and snap the pieces together; and it was a difficult task to paint small pieces in an appropriate manner. Further, the witness considered the imported articles to be very fragile and easily broken. For all of these reasons, he testified that the Airfix kits, Airfix figures, Minitanks and Minitank figures were unsuitable for use by children. He added that the articles were primarily utilized by hobbyists who used them for battle scenes, war games and model railroad layouts.

John Arthur Stanley Gray, the managing director of Airfix Products Ltd. in England (hereafter referred to as "Airfix"), testified that Airfix designs, manufactures and sells construction kits and other items. He indicated that "[p]rimarily, [Airfix is] a toy company of which 50 percent of their business is construction kits."

The witness stated that during the period in question he was responsible for purchasing the plastic and other materials out of which the Airfix articles were made. He testified that two components were used for their manufacture—polyethylene with the code name "G.F." and polystyrene with the code name "4–MCX". The polyethylene compound, G.F., contained 90 percent polyethylene, 8 percent calcium carbonate, and 1½ to 2 percent dyes and pigments. The ingredients added to the polyethylene gave the material certain qualities such as a matt finish which would accept paint and provided a consistency

which permitted desirable details, such as faces and ears, to be produced on the small items. The witness explained that the G.F. formula produced a plastic which was not very brittle, thus enabling items such as the Airfix figures to withstand handling, transportation and manipulation.

Gray further testified that a polystyrene mixture, known as 4–MCX, was used to make the Airfix construction kits. This mixture contained about 90 percent polystyrene and $8\frac{1}{2}$ to 9 percent butadiene which was added to make the polystyrene more flexible and allow for super-detailing (e.g., rivets appearing on airplane wings).

The commissions taken in Austria of Kurt Kopetz and Walter Tschinkel concerned the production of the Minitank vehicles and figures and completed the testimony of plaintiff's commercial witnesses. The testimony of these witnesses showed that the imported Minitank articles were produced by Ing. Heinz Rossler of Austria (hereafter referred to as "Rossler") from a plastic known as Vestyron. Kopetz the head of plastic development for a German chemical plant which produced Vestyron testified that it is an impact-grade polystyrene which is a graft of polymerisate of styrene on styrene buta-diene rubber, and it is a synthetic resin which contains no filler but does contain a pigment in its dispersed phase. This pigment, he stated, is contained in quantities of 0.56 percent but is not chemically bonded to the synthetic resin. Finally, he testified that Vestyron is not the product of a synthetic resin nor does a resin-like substance act as chief binding agent in the compound.

Walter Tschinkel testified via a commission that he was in charge of Rossler's purchasing and selling during 1960–62, and that Rossler's business is "[t]he manufacture of toys, in particular model toys" of which Minitanks are included. Tschinkel testified that he purchased Vestyron for Rossler which in turn produced the Minitank line from this raw material. Vestyron, he said, was ideal for Minitank production because it could be readily pressed and did not break easily.

## II

### Plaintiff's Hobbyists

Plaintiff called 36 adult hobbyist witnesses—including two hobby magazine publishers. These witnesses testified that they used Airfix figures and Minitank items in connection with model railroad layouts, dioramas, battle scenes, sand tables, and war games. Among this number, certain hobbists testified as to their particular skills and interests. For example, one hobbyist was interested in painting and camouflaging tanks for use in realistic military setups which he mounted on trays; another used Minitanks as flatcar loads and in scenery for his model

trains; a college senior used Minitanks in connection with ROTC exercises; one hobbyist was a professional model builder—building and completing other people's models for fees; one hobbyist in San Francisco, California, constructed and collected Minitanks and Airfix figures to the point where he owned 200 Minitanks and 1,500 to 2,000 figures; a hobbyist in San Bernardino, California, tried to teach cub scouts (8 to 10) to build models but they were too young and played with the items in the dirt; a hobbyist who painted and camouflaged tanks used them in realistic military setups in conjunction with his war games club; an older hobbyist observed articles such as those involved here at National Model Railroad Association conventions; and one hobbyist photographed prototype equipment from which new models were constructed and minor flaws in existing model equipment were corrected.

In general, the hobby witnesses testified that the importations were constant in scale, possessed fine detail, and were too fragile to be suitable for use by children. Many of the witnesses had never seen children under the age of 14 using these items, and some were of the opinion that such items were not suitable for children's use.

## III

### PLAINTIFF'S PSYCHOLOGIST

Dr. Barry Bricklin, a psychologist, testified as a rebuttal witness on behalf of plaintiff. He has done research in the field of vocational aptitude; is a consultant at the Walter Reed Army Hospital Research Center, the Kimberton Farm School, the DuPont Company, the National Research Council, and the New York Academy of Medicine; has held the office of president of the Philadelphia Society of Projective Tests; and has done research at the Jefferson Medical College and Hahnemann Medical College, both in Philadelphia. He testified that he had written books on child development and learning and had a daily radio program on a CBS affiliate in Philadelphia. According to the witness, the age group of 9 to 12 is characterized by restless energy; it is the age of trying out musculature, of competition in group activity, of starting things and not finishing them, and of making superficial collections. He went on to say that the most important characteristic of this age group is muscular activity in which competition is of extreme importance. This age group, the witness stated, requires play articles that are not fragile because children in this group "roughhouse" with everything and have little interest in toys which can not be manipulated. At age 13, he indicated, psychological changes occur and youngsters of that age become interested in social activities; in the scale and size of things; and in having things conform to reality.

The record further showed that Associated—the importer—engaged Dr. Bricklin to conduct a series of tests on children between the ages of 9 and 12 with reference to the sample models involved in the incorporated case. On the basis of these tests, Dr. Bricklin testified that with respect to the Minitanks, only 1 percent of the children in the 9 to 12-age group tested were able to get them out of the packages, and as a result, lost interest in them; that with respect to the Airfix kits, with the exception of some major pieces, the children tested could not assemble them; and that with respect to the Airfix figures, the children could not make them stand up and in many instances lost them.

In Dr. Bricklin's opinion, children between 9 and 12 could not play with the imported articles and thus were not their primary users. He added that only precocious or disturbed children were capable of using the Minitanks, and only precocious children and those with an obsessive, compulsive personality could assembly the Airfix kits. On the other hand, in his opinion, the imports were attractive to older people because of their reality and uniqueness.

### DEFENDANT'S WITNESSES

The defendant called 52 witnesses to testify on its behalf. These 52 witnesses fell into three categories: commercial witnesses; children; and a psychologist.

### I

### DEFENDANT'S COMMERCIAL WITNESSES

The defendant presented seven commercial witnesses, all of whom were retail merchants, to rebut the plaintiff's testimony as to whom the imported articles were sold. In this connection, it was testified that a hobby shop in Daly City, California, sold most of its Minitanks and Airfix figures to children between the ages of 10 and 12; a hobby shop in San Francisco sold about 50 percent of its Minitanks and figures to children under the age of 14; a toy and hobby shop in Wilmington, California, sold Minitanks and Airfix kits primarily to children from 7 to 15 years of age; a toy store in Downey, California, sold Minitanks, Airfix figures and kits almost exclusively to children; in Milwaukee, Wisconsin, a sporting goods store sold 95 percent of its Minitanks and Airfix figures to children from 5 to 12 years of age; in Chicago, Illinois, the toy department in a large department store sold 70 to 80 percent of its Minitanks and Airfix figures to children ranging in age from 9 to 13, while its Airfix construction kits were chiefly sold to boys from 10 to 14 years of age.

The final commercial witness was Dorothy Rodenhauer who had been employed for over four years as a sales clerk in the toy depart-

ment of a Sears Roebuck store in Philadelphia, Pennsylvania. This department, she testified, carried a full line of Minitanks, Airfix figures and Airfix construction kits, all of which were displayed in a glass case in the toy department with other small items such as the Matchbook Series cars,[12] miniature dolls and doll clothes. By contrast, she testified that items such as HO equipment trains and accessories (i.e., trestles, track and switches) were considered to be hobby items and were handled by Sears only at Christmas time where they were sold from a special counter.

The witness further testified that she and the toy department manager did the buying for the toy department; that she had personally purchased Minitanks, Airfix figures and Airfix construction kits from B. Paul Model Distributors; and that, in fact, Sears bought almost everything B. Paul Model Distributors sold, including plastic boats for wading pools and balsa wood airplanes—both of which items, the witness stated, are clearly toys and not hobby items.

According to the witness, her toy department sold 50 percent of its Minitanks, 75 percent of its Airfix figures, and 75 percent of its Airfix kits to children. She added that she had given Minitanks to her 5-year old grandson who played with them "as he would with any other little trucks or cars, running them back and forth into each other, and shooting them under the chairs."

## II

### DEFENDANT'S CHILD WITNESSES

The defendant presented the testimony of 43 boys, all of whom testified that they used one or more of the imported articles without difficulty. This group was composed of two 8-year olds; three 9-year olds; seven 10-year olds; thirteen 11-year olds; ten 12-year olds; six 13-year olds; and two 14-year olds.

Those children who used Airfix figures testified that not only did they collect them but also played with them in a variety of places, including outdoor sandboxes and rooms inside their homes. The children stated that they had no difficulty in removing the sprues which they indicated they did by clipping, twisting, cutting or filing them off. After the sprues were removed, most of the children played with the figures as they came from the box, while a few painted them. The children did not find the figures to be fragile, but some stated that they were easily lost.

A number of the children testified that they used the Minitanks for war games, for collecting and for maneuvering them on the floor like

[12] Matchbook Series cars were characterized as toys in *Fred Bronner Corp.* v. *United States,* 57 Cust. Ct. 428, 434, 437, C.D. 2832 (1966).

little trucks. Many of the children did not find the Minitanks to be fragile and had no difficulty with them, while others testified that they were fragile and easily broken, and, therefore, had to be handled with care.

Fourteen of the children, ranging in age from 8 to 14, testified that they had completely assembled one or more of the Airfix construction kits. Thus, one 10-year old stated that he built the Airfix model of the HMS Hood in three hours without any difficulty; an 11-year old testified that he had completed two Airfix models, the Churchill Bomber and the Avro Anson; another 11-year old testified that he had put the 40H Footbridge together; a 12-year old stated that he had built the Seahawk in 45 minutes without tools; and another 12-year old indicated that he built the Hurricane Hawker in two and one-half hours without any help and without any tools.

A child care worker from the Pleasantville Cottage School, Pleasantville, New York—a school for State charges and children from broken homes (some emotionally disturbed)—testified that the boys in his cottage played with items such as those imported and that the children under the age of 13 were able to assemble kits similar to the Airfix kits.

## III

### DEFENDANT'S PSYCHOLOGIST

Dr. Charles Winick, a psychologist who specializes in child development, testified that he has taught psychology at New York University, Columbia University, University of Rochester, Queens College, Massachusetts Institute of Technology, Long Island University and City College of New York; authored 152 articles and seven books dealing with social behavior, child development and leisure activities; and is a fellow of the American Psychological Association. In 1963, he won the George Foster Peabody Award for his book *For The Young Viewer.* In 1960, he won the Flowerman Award for the best scholarly publication on group behavior. During the past 15 years, he has conducted studies in the field of play activities of children and hobby activities of adults. He testified that his studies for Eastman Kodak, J. Walter Thompson and NBC have enhanced his familiarity with the manual dexterity, mental capabilities and manipulative skills of children in relation to model building.

In Dr. Winick's opinion, the model building of the Airfix kits was well within the capabilities of boys from age 9 to 12. In fact, he stated, he had seen such kits used as part of a number of national studies of that age group. Boys between the ages of 9 to 12, he testified, are interested in the Minitanks and Airfix construction kits and figures because they (1) identify with military heroes—part of their preoc-

cupation with masculine activities and (2) attain self-satisfaction from working with such articles and from assembling, completing and playing with them. These factors, he indicated, are partly responsible for the 9 to 12-year ages being known as the "hobby years".

The witness further testified that he had personally seen 9 to 12-year olds "work with * * * [articles such as those in issue], play with them on tables, floors, shelves, in little exhibits in their rooms * * *." Adults and teen-agers, he continued, also use these items but have more elaborate and better organized displays, frequently constructing complicated scenes.

Based on his observations, the witness was of the opinion that the predominant use of the merchandise before the court was by the pre-adolescent 9 to 12-age group. He added that the uses of these articles was an exciting, fulfilling experience for children since they possessed the necessary time and patience to work with them. Adults, he said, do not have the requisite time and patience for this activity, do not find the military as romantic as children, and their social activity is not geared for such a pursuit.

Further, Dr. Winick stated that the boys in the 9 to 12-age group translate their aptitude into behavior. Thus, their manipulative motor skills, perceptional ability and ability to read instructions, together with an interest in engaging in activities with friends, not only made model building well within their reach but related to work done in school in the fourth to sixth grades. According to the witness, however difficult these kits were to assemble, preadolescents seemed to have a sufficient level of skill to complete the task.

## The Law

In the incorporated case—*Davies, Turner, & Co.* v. *United States*, 61 Cust. Ct. 311, C.D. 3621, 292 F. Supp. 722 (1968), the court (as observed previously) held that plaintiff did not establish the correctness of its affirmative claims; hence the court did not reach the question as to whether or not the imported articles were correctly classified as toys. More particularly, in the incorporated case, although one of plaintiff's alternative claims was under the provisions of paragraph 1539(b) of the Tariff Act of 1930, as modified,[13] plaintiff presented no evidence as to whether or not the importations were manufactured from a product which had a synthetic resin or resin-like substance as its chief binding agent. Since plaintiff thus failed to show that the imported items were not included within paragraph 1539(b)—an enumerating provision—its claims for classification of the importations

---

[13] As previously mentioned, paragraph 1539(b) covered "[m]anufactures wholly or in chief value of any product described in the preceding item 1539(b), or of any other product of which any synthetic resin or resin-like substance is the chief binding agent."

by similitude or as nonenumerated articles necessarily had to fall—this on the basis that to invoke either of these latter provisions, it was incumbent upon the plaintiff to establish that the merchandise was not included within any of the enumerating provisions of the tariff act. By way of contrast, in the present controversy, plaintiff has produced evidence regarding the products out of which the importations have been manufactured and since this evidence establishes that particular articles were within the purview of paragraph 1539(b), while other articles were not, we must now consider whether or not government's classification of the imported items under paragraph 1513 as toys, i.e., articles chiefly used for the amusement of children, was correct.

Stated otherwise, in view of the fact that the government's classification is presumed to be correct, the problem remaining is to determine whether or not plaintiff has overcome that presumption by establishing that the importations were not chiefly used for the amusement of children and thus not classifiable as toys. See e.g., *United States* v. *F. W. Woolworth Co.*, 28 CCPA 196, 197, C.A.D. 145 (1940) ; *Novelty Import Co., Inc.* v. *United States*, 53 CCPA 28, 32, C.A.D. 872 (1966). On this question, we must conclude for the reasons that follow that plaintiff has failed to overcome the presumption that the articles were chiefly used for the amusement of children.

At the outset, it is fundamental that in order to establish chief use, it is usually necessary to show the chief use of the article throughout a geographic cross-section of the United States. E.g., *L. Tobert Co., Inc.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953). However, in the incorporated case, the parties agreed that there was no variance as to the use of the importations based upon geographic considerations and that use of the imported articles did not vary from one part of the country to the other.

Viewed in this light, a principal argument of plaintiff is that it has (assertedly) established that the imported articles were known and sold in the trade as hobby items, from which, according to plaintiff, it follows that the articles were chiefly used by hobbyists. In this connection, the witness Paul, the president of the importing concern, testified (as noted previously) that with a minor exception the merchandise was exclusively advertised in hobby trade magazines; that 95 percent of the merchandise was sold to hobby trade stores; and that, as distinguished from the "toy trade", the merchandise was purchased by different buyers and in different seasons. As to this, it is quite true that the manner in which an article is merchandised has probative value in determining the nature of that article. See e.g., *Davis Products, Inc.* v. *United States*, 59 Cust. Ct. 226, 230, C.D. 3127

(1967) ; *New York Merchandise Co., Inc.* v. *United States*, 62 Cust. Ct. 38, 44, C.D. 3671, 294 F. Supp. 971, 976 (1969) ; *Montgomery Ward & Co.* v. *United States*, 62 Cust. Ct. 718, 724, C.D. 3853 (1969). However, such merchandising practices are not conclusive in this respect. See e.g., *International Customs Service, Inc.* v. *United States*, 62 Cust. Ct. 653, 658, C.D. 3843 (1969) ; *The Spesco Corporation* v. *United States*, 62 Cust. Ct. 297, 303, C.D. 3749 (1969) ; *Associated Hobby Mfrs., Inc.* v. *United States*, 67 Cust. Ct. 391, 398–99, C.D. 4302 (1971), *aff'd* 60 CCPA 121, C.A.D. 1093 (1973) ; *S. Rosenberg Christmas Corp.* v. *United States*, 51 Cust. Ct. 283, Abstract 68170 (1963) ; *Novelty Import Co., Inc.* v. *United States*, 53 Cust. Ct. 274, Abstract 68780 (1964) ; *United States* v. *Ignaz Strauss & Co., Inc.*, 37 CCPA 32, C.A.D. 415 (1949).

With respect to merchandising practices, one difficulty with Paul's testimony is that it does not establish the metes and bounds of his definition of a hobby store. For example, since Paul testified that his company sold the imported articles to such retail chains as Sears Roebuck, J. C. Penney, Montgomery Ward, F. W. Woolworth, Neisner Bros., S. S. Kresge, etc., these chains presumably were considered by Paul to be hobby stores. The testimony has shown, however, that such stores were not strictly hobby stores; nor was it shown that sales in these stores of the articles in issue were chiefly to adults rather than to children. Indeed, the only testimony on this phase was that sales of the imported articles by a Sears Roebuck store in Philadelphia were chiefly to children and not to adults.

Also, it will be recalled that the witness Paul testified that his company, Associated, sold to the hobby buyer of Sears Roebuck's toy department and that Associated's contracts with Sears (and other retail chain stores) precluded Associated and its wholesale distributors from supplying toy items to Sears (or these other chains). Apart from the fact that not one of these contracts was produced in court, the testimony of Paul with respect to his company's dealings with Sears was refuted by the testimony of Mrs. Dorothy Rodenhauer, a sales clerk in the toy department of Sears Roebuck's store in Philadelphia. For example, in contrast to Paul's testimony that the importations were sold to the hobby buyer of Sears, Mrs. Rodenhauer testified that she and the toy department manager—and not the hobby buyer—purchased the imported articles from Associated's Philadelphia distributor, adding that the imported articles were sold at the toy counter with other toy items rather than at the hobby counter. In addition, contrary to Paul's testimony that Associated and its distributors were precluded from selling toy items to Sears, the witness Rodenhauer made clear that various items that were obviously toys were in fact sold to Sears by the Philadelphia distributor of Associated.

It is interesting to note, too, that while plaintiff's witness Paul characterized Airfix Industries (the manufacturer of the Airfix figures and kits in issue) as the largest producer of hobby items in Europe, the managing director of that company testified that "[p]rimarily, [Airfix is] a *toy* company * * *." [Emphasis added.] To similar effect, the witness Tschinkel testified, via a commission, that the business of the Rossler company—which manufactured the Minitank items—is "[t]he manufacture of toys, in particular model toys" of which Minitanks are included.

Plaintiff's second argument to support its position that the imported articles were not chiefly used by children is based on the premise that the record showed that such articles were unsuitable for use by children. In this connection, its commercial witnesses testified (as we have seen) that children lacked manual dexterity and patience to use the importations, and further that the importations were too fragile and small for children's use. Also, many of the hobbyists called by plaintiff testified that they had never seen children under the age of 14 play with the items and some were of the opinion that the items were not suitable for children's use.

In a similar vein, plaintiff's psychologist, Dr. Bricklin, testified (as discussed earlier) that the tests conducted in his office demonstrated that the children tested could not assemble the Airfix kits, could not make the Airfix figures stand up and were prone to lose them. As a result of these tests, Dr. Bricklin was of the opinion that normal children between the ages of 9 and 12 could not play with the articles, and that only precocious or disturbed children could use the Minitanks, while only precocious or obsessive and compulsive children could assemble the Airfix kits.

The foregoing testimony—to the effect that the imported articles were unsuitable for use by children—is rebutted, however, by the testimony of 43 children, all of whom—without contradiction—made it clear that they were able to and actually used one or more of the imported articles for their amusement. It is true that some of these children found certain items fragile,[14] while others did not. But whatever skill was required for use and enjoyment of the imported articles, the record leaves no doubt that the children possessed it.[15]

The testimony of both plaintiff's and defendant's commercial witnesses further demonstrated that the importations were suitable for use by children. For leaving aside the question of chief use, all the commercial witnesses testified that they sold the imported items to children whether such sales amounted to 10 percent or 90 percent

---

[14] The fact that an item is fragile does not disqualify it from being a plaything for children. E.g., *United States* v. *Sheldon & Co.,* 14 Ct. Cust. Appls. 260, 261–62, T.D. 41879 (1926) ; *The Spesco Corporation* v. *United States,* 62 Cust. Ct. 297, 304, C.D. 3749 (1969).

[15] The record further indicates that the children testifying were normal, average children who were not precocious, obsessive, compulsive or emotionally disturbed.

of their total sales. What is more, the court's own examination of each of the sample importations leaves no doubt that they are obviously appealing and well-suited for children's use. Reinforcing this conclusion is the nature of their packaging and their relatively inexpensive retail price which ranged from 25 cents to $1.00 a box.

Finally, in an effort to sustain its proof on the issue of chief use, plaintiff called hobby and toy store owners who testified that the majority of their retail sales of the imported articles were to adults for their own use rather than to children. These witnesses stated that the percentage of sales to adults was in the range of 90 percent for the Airfix kits and 60 to 80 percent for the Airfix figures and Minitanks. The witness Paul also testified that the imported articles were not chiefly used by children on the ground that such use was too difficult and frustrating for them. For this reason, Paul indicated that Associated did not encourage retailers to sell the importations to children.

Pointing out that the testimony of commercial witnesses has considerable weight on the question of chief use (*United States* v. *The Baltimore & Ohio R.R. Co.*, 47 CCPA 1, C.A.D. 719 (1959)), plaintiff contends that the testimony of such witnesses establishes that the chief use of the importations was by adults and not children.

To rebut this evidence, defendant produced commercial witnesses from hobby and toy stores who testified that in their stores the majority of sales of the imported articles was to children for their own use rather than to adults. Thus, it was testified that in some stores, 95 percent of the Minitank and Airfix figure items and 75 percent or more of the Airfix kits were sold to children.

On the basis of all the testimony concerning retail sales, the most that can be concluded is that certain stores sold a majority of the Airfix figures, Airfix kits and Minitanks to adults, while other stores sold a majority of these items to children.

Lastly, each of the parties sought to establish chief use through the testimony of a psychologist. Thus, defendant's witness, Dr. Winick, who had virtually made a career of studying the play activities of children and the leisure or hobby activities of adults, expressed the opinion that the chief users of the imported merchandise were pre-adolescent boys from 9 to 12 years of age. The basis of his opinion was that children in that age group have the capacity and aptitude to use the models in question; are extremely interested in military matters and hence find the articles attractive; and have the leisure time and patience for such activities. In contrast, Winick indicated that adults lack the requisite time and patience to pursue this activity, have less initial interest in the importations since they find the military less romantic, and that "there is little or no organized [adult] social activity that is geared to the use of these products * * *."

By way of rebuttal, it was the opinion of the plaintiff's psychologist, Dr. Bricklin, that children from the ages of 9 to 12 were not the chief users of the importations. This opinion was based solely on a study conducted in Dr. Bricklin's office which was sponsored by the importer—Associated. This study, according to Bricklin, showed that the age of 9 to 12 is characterized by restless energy, competitiveness in group activities, and superficial collections. Children in this age group, he stated, were incapable of completing the Airfix construction kits; successfully de-packaging the Minitank items; and playing with the Airfix figures.

While both psychologists seemed well-qualified in their fields, there are several factors which lessen the probative value of Dr. Bricklin's testimony. First, he was hired by the importer to conduct his study after the testimony of defendant's psychologist was a matter of record; second, he did not see any of the children he tested in a normal home situation; third, his finding that only 1 percent of the children tested could successfully de-package the Minitank item is incredible upon an examination of the samples; fourth, his opinion that only precocious, disturbed or compulsive children could use certain of the items is unpersuasive, considering the testimony of the 44 children with regard to their own personal use of such items.

In conclusion, we must again emphasize that the government's classification is presumed correct and that the burden is on the importer who protests that classification to show that it is wrong (and also to prove what is the correct classification). To sustain its burden in the present case, plaintiff was required to prove that a greater quantity of the imported merchandise which was being used in the United States at or about the time of importation was, in fact, used by adults rather than by children as playthings. In this light, weighing all the evidence before us (i.e., the testimony of the commercial witnesses, the hobbyists, the children and the psychologists) and upon examination of the samples in evidence, we think it clear that plaintiff has failed to sustain its burden of proving that the importations were chiefly used by adults and not by children for their amusement.

The protests are therefore overruled and judgment will be entered accordingly.

(C.D. 4429)